**WORMAN ENTERPRISES, INC.,**
Appellant (Plaintiff below),

v.

**The BOONE COUNTY SOLID WASTE MANAGEMENT DISTRICT, Appellee** (Defendant below).

No. 06S01–0306–CV–254.

Supreme Court of Indiana.

March 9, 2004.

Mark R. Waterfill, Cynthia M. Kirk, Indianapolis, IN, Attorneys for Appellant.

Larry J. Kane, Katherine L. Shelby, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

We hold that the board of a solid waste management district is not subject to the strict prohibition on *ex parte* communications that applies to a court or an administrative agency acting in a purely adjudicatory role.

### Factual and Procedural Background

The Boone County Solid Waste Management District (District) was created pursuant to Indiana Code Article 13–21. That Article authorizes the District, *inter alia*, (1) "to develop and implement a district solid waste management plan"; (2) "to otherwise do all things necessary for the reduction, management, and disposal of solid waste; and recovery of waste products from the solid waste stream"; and (3) "to adopt resolutions that have the force of law." Ind.Code § 13–21–3–12 (2002). Worman's facility processes trees, brush, leaves, grass, and dirt and sells the resultant mulch. Worman also processes concrete and bricks and sells the resultant stone.

At some point before September 1998 the District sued Worman, claiming that Worman's facility was an illegal and unpermitted site. In that month, the District adopted Resolution 98–3, prescribing "certain requirements for the permitting and operation of solid waste facilities and clean fill sites within the Boone County Solid Waste Management District." Worman and the District then settled the lawsuit on October 6, 1998. The parties agreed, among other things, that Worman would submit a permit application for a Long–Term Clean Fill Processing and Recycling Facility. The lawsuit was to be dismissed only when the permit issued to Worman contained terms mutually acceptable to Worman and the District. On July 28,

1999, Worman submitted its application. The Board received comments on the application at its July and September public meetings. Outside of the public hearings, Board members viewed the site and engaged in conversations with citizens who were interested in Worman's permit.

After its October 11, 2000, meeting, the Board issued Worman a Long–Term Clean Fill and Recycling Permit. Worman then returned to court arguing that the District did not have the authority to issue the permit and that the permitting process was unlawful because of *ex parte* communications between the Board and private citizens. Worman also contended that even if the permitting process was lawful, certain conditions imposed by the permit were illegal. The District successfully moved for summary judgment. On appeal, the Court of Appeals held that the District, as a matter of law, has the authority to regulate Worman's facility, but that genuine issues of material fact existed concerning the propriety of *ex parte* communications during the permit process. Accordingly, summary judgment was inappropriate. This Court granted transfer.

■ "The standard of review of a grant or denial of a motion for summary judgment is the same as that used in the trial court: summary judgment is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party." *Corr v. Am. Family Ins.*, 767 N.E.2d 535, 537–38 (Ind.2002) (citing *Bemenderfer v. Williams*, 745 N.E.2d 212, 215 (Ind.2001)).

## I. The District's Authority over Solid Waste

■ Worman argues that because the conduct regulated in the permit is regulated by the Indiana Department of Environmental Management (IDEM), the District's power to regulate Worman's facility is preempted. Ind.Code § 36–1–3–8(a)(7) (1998). The Home Rule Act significantly expanded the powers of "units" of local government, but expressly prohibited regulation by local agencies of conduct already regulated by a state agency. *Id.* Worman points out that the Indiana Department of Environmental Management regulates solid and hazardous waste in Indiana pursuant to Indiana Code section 13–19–3–1. Worman argues that IDEM "routinely inspects Worman's facility," so the Home Rule Act bars regulation by the District because IDEM regulates Worman's facility. The Court of Appeals held that the Home Rule Act's prohibitions do not apply to the District because the District is not a governmental "unit" to which the Home Rule Act applies. I.C. § 36–1–3–1. As the Court of Appeals noted, a "unit" is defined in the Home Rule Act as a "county, municipality, or township." I.C. § 36–1–2–23. Though the District is none of these, Worman argues that because the members of the Board are executive officials of Boone County, as required by statute, I.C. § 13–21–3–6(a), the District is an arm of the County and is therefore a "unit" of local government.

We conclude that the Home Rule Act does not prohibit solid waste management districts from regulating solid waste. The districts are not technically "units" as the Home Rule Act uses that term. Not all solid waste management districts are co-terminous with a county. The statute governing solid waste management districts permits counties to join to form a single solid waste management district. I.C. § 13–21–3–1. If a county chooses to "designate itself as a county solid waste management district" or if the county fails to

join or designate itself, the county will be designated by the IDEM commissioner as a county solid waste management district. *Id.* The Boone County Solid Waste Management District was established for Boone County either by designation or by default. Further, the statute expressly grants solid waste management districts specific powers that counties already possess, such as the power to adopt resolutions with the force of law and the power to sue and be sued. I.C. § 13–21–3–12. If the District were the same as the county, these grants of power would be surplusage. The District's Board includes executive officials of municipalities within the District as well as executives of county government. I.C. § 13–21–3–5(a). Thus, although the District is coterminous with Boone County, and in that sense the County itself is designated as the District, the District's governance is not the same as the County's.

Perhaps more importantly, even if the District is viewed as the County and therefore a "unit," the specific grant of authority in the Solid Waste Management District Act governs over the general terms of the Home Rule Act. *Ind. Dep't Natural Res. v. Newton County*, 802 N.E.2d 430, 433 (Ind. 2004). The statute creating and governing Districts specifically grants authority to regulate solid waste, I.C. § 13–21–3–12, and calls for the districts to collaborate with IDEM to deal with solid waste issues. *See* I.C. § 13–21–5–1 ("Each district shall adopt and submit to the [IDEM] commissioner for approval a district solid waste management plan."). If the Home Rule Act precluded solid waste management districts from regulating this conduct because IDEM regulates the conduct, then there would be no purpose to solid waste management districts at all. In sum, the District is not precluded by the Home Rule Act because it is separate in organization and power from Boone County and enjoys express authority to regulate solid waste.[1]

## II. *Ex Parte* Communications

■ On several occasions while Worman's permit was pending, members of the Board communicated with public citizens about the permit. For example, one member of the Board spoke with citizens who called her home with specific complaints about Worman's facility. Citizens also approached that member at the post office and grocery store to discuss the Worman facility. Another member viewed the site through binoculars from a neighbor's home. Worman argues that these communications between members of the Board and private citizens regarding its permit application constituted impermissible *ex parte* communications that prejudiced the Board against Worman's application and violated Worman's due process rights. The trial court disagreed and granted the District's motion for summary judgment. The Court of Appeals reversed, concluding that the Board's action was adjudicatory in nature and that there was a genuine issue of material fact whether the Board made these communications with the public known and whether those communications influenced the permitting process.

■ Black's Law Dictionary defines *ex parte* communications as "a generally

---

1. Indiana Code section 13–21–3–14(a) provides, with certain exceptions, "... the powers of a district do not include the following...." Effective July 1, 2003, subsection (a) was amended to add a new subsection (5) that reads: "The power to issue permits for an activity that is already permitted by a state agency, except as provided by statute." The parties have advanced no arguments based on this amendment, which became effective after the decision of the Court of Appeals in this case, and we express no opinion as to its effect.

prohibited communication between counsel and the court when opposing counsel is not present." *Black's Law Dictionary* 597 (7th ed.1999). As this definition suggests, *ex parte* communications most often become an issue if a judge communicates outside the courtroom without disclosing those communications to everyone involved. These communications are prohibited. *See* Ind. Judicial Conduct Canon 3(B)(8); *see, e.g., In re Kern,* 774 N.E.2d 878, 879 (Ind.2002) (judge participated in improper *ex parte* communications when he communicated with and aided a father in a custody dispute without the knowledge of the mother); *Garrard v. Stone,* 624 N.E.2d 68, 70 (Ind.Ct.App.1993) (even testimony by a family therapist could not cure the error when a trial judge initiated communication with the therapist without informing either party). Due process may be denied if the parties are not given the opportunity to hear and comment on all of the evidence considered in their case. *See Majors v. State,* 773 N.E.2d 231, 234 (Ind. 2002). For the same reason, reliance on *ex parte* communications is not allowed in administrative hearings of an adjudicatory nature. *State Bd. of Tax Comm'rs v. Oliverius,* 156 Ind.App. 46, 54, 294 N.E.2d 646, 651 (1973). Worman contends that Board's permitting process was adjudicatory and therefore the conversations between members of the Board and the public constituted *ex parte* communications. Worman posits that whether the Board was biased by these communications is an issue of fact that must be reserved for at trial.

Worman's argument proceeds from a misunderstanding of the permit process. *Ex parte* communications are impermissible in adjudicatory settings, but they are widely accepted and even expected in legislative settings. We think that the Board is not an adjudicatory body for these purposes and its permitting process is not

analogous to the adjudicatory function of a court. The Board is a local agency composed mostly of locally elected officials. I.C. § 13–21–3–5. By statute, the Board is made up of officials from the county executive, the county fiscal body, the executives of cities in the District, and members of the legislative bodies of cities in the District. *Id.* These officials, by the nature of their executive or legislative positions, are expected to be open and respond to the concerns of their constituents. The permitting process is not subject to the Administrative Orders and Procedures Act (AOPA) because the District does not have statewide jurisdiction. I.C. §§ 4–21.5–2–3; 4–21.5–1–3. Agencies subject to the federal Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* (2000), are governed by an explicit statutory prohibition against *ex parte* communications in adjudicatory proceedings. 5 U.S.C. § 557(d)(1). But even those agencies, if engaged in permitting or licensing, perform something of a hybrid function, and communications with industry officials or others knowledgeable on the policy issues presented by a license applicant may be appropriate. *See Louisiana Ass'n of Indep. Producers & Royalty Owners v. FERC,* 958 F.2d 1101 (D.C.Cir. 1992); Kenneth Culp Davis & Richard J. Pierce, Jr. *Administrative Law Treatise* § 8.4 (3d ed.1994). Here, although the permitting process has some aspects of adjudication, it is not purely adjudicatory. Rather, the permitting process has characteristics of both legislative and adjudicatory roles, and is most analogous to licensing, a hybrid function properly subject to less restrictive processes than court or administrative adjudication. *See* Frank E. Cooper, *State Administrative Law* 483 (1965) ("Licensing activities constitute a distinctive genre, partaking of the characteristics both of rule making and adjudication.").

District members are local officials who are expected to receive citizen input in a less formalized manner than a court proceeding.[2] The statute does not purport to convert this Board into judges subject to judicial standards, and includes no restriction on their contacts. Accordingly, we do not find the permitting process fatally flawed by these contacts with the public or independent investigations by members. If the legislature chooses, it may impose more restrictions on the District's permitting process. In the absence of a legislative declaration that Board members are not to engage in *ex parte* communications, we believe the Board is sufficiently distinct in composition and function that it is not subject to the prohibitions against *ex parte* communications that apply to administrative agencies under AOPA and to courts under the Code of Judicial Conduct.

### III. Challenged Permit Conditions

In addition to challenging the general authority of the District to regulate its facility and challenging alleged *ex parte* communications between members of the District and members of the public, Worman challenges several specific conditions of its permit.

■ As an initial matter, the District contends these claims are waived. Letters from Worman's attorney to the District state that various conditions in the permit are "acceptable." The District argues that these statements constitute a waiver of challenges to these provisions.[3] The District also argues that Worman is estopped from challenging those conditions because

the letters invited the District to issue a permit containing those conditions.

■ Worman responds that the letters the District cites were written in an attempt to reach a compromise regarding the permit pursuant to the settlement agreement of the first lawsuit. In that lawsuit the District had sued Worman for operating its facility without a permit. The parties settled, agreeing that Worman would submit a permit application. The settlement agreement provided: "The parties agree that if and when permits as referred to above have been issued to Worman with terms and conditions mutually acceptable to the District and Worman, then and only then shall the parties dismiss with prejudice the pending lawsuit." Worman reasons that the communications between Worman and the District during the permitting process were part of efforts to consummate the settlement and are therefore inadmissible pursuant to Indiana Evidence Rule 408. That Rule provides that evidence of conduct or statements in negotiations is not admissible to prove liability, invalidity of a claim, or amount of a claim. Although Worman stated that conditions in a draft permit were "acceptable" in the context of trying to reach an agreement, we take this to be nothing more than an indication that a proposed resolution of one issue was acceptable if a package could be agreed upon. Worman and the District never agreed upon a permit with all of the terms of the final permit at issue here. The purpose of Evidence Rule 408 is to promote candor by excluding admissions of fact or law. Interim negotiating conces-

---

2. The District's Board of Directors consists of two people from the county executive, one person from the county fiscal body, the executive of the largest city or town in the county, one person who is either the executive of or a member of the legislative body of a different city or town, and, inexplicably, "one addition-

al member from the membership of the county executive." I.C. § 13–21–3–5(a).

3. The District claims Worman has waived its right to challenge provisions A.1, A.2, A.4, A.6, C.7, C.9, D.1, D.2, D.3 and D.5.

sions are in that category. As a result, these statements are not admissible into evidence to prove, as the District tries to do, that Worman has waived them.

### A. Permit condition B: Asphalt

■ Worman first challenges permit provision B which restricts recycling of asphalt at the facility. This permit condition provides, "[a]sphalt will be accepted only in reasonable quantities limited to use for on-site road construction." Worman argues that there is a dispute as to the meaning of this condition and that it should be allowed to accept asphalt for recycling purposes. Worman points out that, in his deposition, the District's Administrator said that he believed that in addition to the use of asphalt for on-site construction, asphalt recycling would be allowed at Worman's facility. Worman asserts that because this statement conflicts with the language of the permit, a genuine issue of material fact exists as to the meaning of the permit terms. The Administrator does not have the power to alter the permit by his recollection of it. The terms of the permit are binding and are clear that asphalt should be used only for on-site road construction. There is no issue for trial here.

■ The District promulgated Resolution 98–3 to provide itself and those it regulates with guidelines for permitting and operating solid waste facilities and clean fill sites. Worman argues that there is a genuine issue of material fact as to whether the District has authority under Resolution 98–3 to limit the use of asphalt to on-site uses because the Resolution makes no express mention of asphalt. The Resolution requires a permit application to include a description of the type of material to be processed at the facility and "[a] detailed description of all processes used in the handling, sorting, processing, and

transportation of the waste...." The Resolution also contains a provision requiring the District to review, among other things, whether the permit application satisfies the requirements of the Resolution. If the application is complete, the District is directed to grant the permit with whatever conditions that are necessary to assure compliance with the Resolution. This framework makes clear that permits will be granted based on the information given in the application. In its original application, Worman did not list asphalt as a type of material it would receive, but did explain that it would use asphalt for on-site construction and roads. Worman did not describe any other use for asphalt at the facility. In its amended application, Worman included asphalt as a material that would be accepted, but did not describe any use for asphalt other than for on-site construction and roads. The District's Resolution requires a description of all uses of material in a permit application. The only use of asphalt Worman described in its permit application was on-site road construction. The restriction on the use of asphalt was therefore consistent with the District's permit application and with Resolution 98–3.

### B. Permit Condition B: "Dimension Lumber"

■ Worman also challenges the permit condition prohibiting the handling of "dimension lumber." The application says, "Worman's does not accept ... normal board lumber...." The District argues that "normal board lumber" is the same as "dimension lumber" and because Worman's permit application said it would not take "normal board lumber," the District properly prohibited dimension lumber. Worman does not define dimension lumber except to say that it is different from "normal board lumber." Webster's Dictio-

nary defines "dimension" as "wood or stone cut to pieces of specified size." *Merriam–Webster's Collegiate Dictionary* 325 (10th ed.1993). This is a common enough definition of dimension lumber and is equivalent to common usages of the term "board lumber." Worman has not raised a genuine issue of material fact as to its definition and whether it can be excluded from the permit.

■ Worman also argues that this permit provision is unconstitutionally vague because of lack of clarity of the term "dimension lumber." Due process requires that "standards should be written with sufficient precision in order to give fair warning as to what the agency will consider in making its decision." *Union Tank Car, Fleet Operations v. Comm'r of Labor,* 671 N.E.2d 885, 889 (Ind.Ct.App. 1996). "The test to be applied in determining whether an administrative agency regulation can withstand a challenge for vagueness is whether it is so indefinite that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Taylor v. Ind. Family & Soc. Servs. Admin.,* 699 N.E.2d 1186, 1192 (Ind.Ct.App.1998) (quoting *Ind. State Ethics Comm'n v. Nelson,* 656 N.E.2d 1172 (Ind.Ct.App.1995)). Because "dimension lumber" has a common, generally accepted usage, "cut to pieces of a specified size," this condition is specific enough to satisfy due process.

### C. *Permit Conditions C.9 and D.1: Fire Suppression and Dust Control*

■ Permit condition C.9 calls for the use of fire suppression techniques and condition D.1 requires the facility to prevent dust from blowing off of the property onto other land. Worman argues that these conditions generally apply to composting facilities and because Worman's facility does not compost, these conditions

are not applicable to its facility. Whether the facility composts or not, Section 2–5(d)(7) of Resolution 98–3 states that a permit application must contain a description of the applicant's proposed procedures for controlling dust and fire. The provision grants the District the authority to condition its permit on Worman's proper treatment of these problems. Indeed, Worman's application includes a section describing its fire prevention procedures. There is no issue for trial here.

### D. *Permit Condition A.8: Lack of Compliance as Basis for Revocation of Permit*

■ Worman next challenges the permit provisions that reserve the District's right to revoke the permit if Worman fails to comply with its requirements. Worman challenges these conditions on the ground that the Resolution does not define a "material violation" and because the permit cites "lack of compliance," not "material violation" as basis for revocation. The term "material" appears in innumerable statutes, and revocation for material violation of conditions seems self-evidently within the District's authority. This contention is frivolous.

### E. *Permit Condition D.3: Odors*

■ Worman argues that permit condition D.3 is beyond the scope of the Resolution and unconstitutionally vague. This condition states "Odors will be controlled by processing materials quickly minimizing the amount of time odor causing materials are kept in piles and by introducing woodchips/or [sic] leaves into green material and maintaining aerobic conditions." Section 9–6(a) of Resolution 98–3 provides, "Vectors, dust, odors, and noise must be controlled at all times at the facility so that they do not constitute a nuisance or a health hazard." The District may impose

permit provisions that are reasonable to assure compliance with the Resolution, and the Resolution contemplates the prevention of odor problems. Nor is the provision unconstitutionally vague or overbroad. Worman focuses on the requirement that processing is to be accomplished "quickly" and argues that this term is impermissibly vague because there is no specific time that materials are to be kept at the facility. Worman points out that a member of the District expressed concern that "excessively large" piles of material at the facility were not in compliance with the Resolution or the permit. We agree that the provision does not impose any specific time constraint on the processing of materials. The provision is in implementation of the Resolution requirement that odors not become a nuisance or health hazard. It is subject to this standard. To be sure, one may debate what constitutes a nuisance but the District is not required to anticipate all means by which this activity could constitute an unreasonable risk to the health or convenience of others. Worman also argues that this provision of the permit is not applicable to its facility because it does not currently have an odor problem. If that is the case, this condition would have no effect, but that does not render it invalid.

F. *Permit Condition A.7: Closure Plan*

■ Worman challenges permit condition A.7 which says, "the applicant will submit a closure plan by April 01, 2001 and will include procedures to be used to remove materials for sale or distribution." Worman claims that this provision is outside the scope of the Resolution. Section 10–1 of the Resolution states, "A closure plan similar to that provided for in 329 IAC 10–37 may be required by the Board for clean fill sites, solid waste processing facilities and incinerators where the pro-

posed solid waste storage or handling practices may pose a threat to human health and the environment...." Worman points to testimony of the District's Administrator that shutting down the facility would pose no danger to health. But Worman's application admits that the nature of the site is such that a fire hazard is possible. This invokes the Resolution's provision for closure plans of facilities that may pose a danger to health or the environment.

G. *Permit Condition A.1 and A.9*

■ Permit conditions A.1 and A.9 were challenged as beyond the scope of the Resolution, but Worman did not elaborate this argument on appeal, so it is waived. Ind. Appellate Rule 46(A)(8)(a); *see also, Woodruff v. Klein,* 762 N.E.2d 223, 229 (Ind.Ct.App.2002).

H. *Permit Conditions A.2, A.6, and D.2: Conditions within the Jurisdiction of other Agencies*

Worman argues that certain permit provisions are improper because they lie within the exclusive jurisdiction of other governmental bodies. Worman says that because violation of permit provisions might result in revocation of the permit, the provisions amount to an attempt to enforce regulations subject to the exclusive jurisdiction of state agencies.

■ First, condition A.2 provides, "the Applicant shall construct adequate ingress and egress lanes on Zionsville Road by April 01, 2001 in order to comply with conditions of the BZA special exception." Worman argues that this is an attempt to regulate that which is in the exclusive jurisdiction of the Board of Zoning Appeals. The District points to Section 2–5(b)(12) of its Resolution and argues, "Although the District may not have the authority to

enforce the requirements of the special exception granted by the BZA, the District clearly has the authority to require Worman to submit verification of proper zoning status." We agree.

■ Next, permit condition A.6 requires Worman to submit a storm water management plan in accordance with IDEM and Indiana Department of Natural Resources requirements. Worman challenges this condition as within the exclusive jurisdiction of IDEM and DNR. The District admits that Worman has complied with this condition and this issue therefore is moot.

■ Last, Worman challenges permit condition D.2 which states that "Compliance with appropriate Occupational Safety & Health Administration (OSHA) and Indiana Occupational Safety & Health Administration (IOSHA) noise standards will be required to minimize noise levels." Section 2–5(d)(7) of the Resolution provides that a permit application should describe procedures for controlling noise. The District imposed this permit provision to provide a standard by which noise will be measured for purposes of enforcing its Resolution, which expressly allows for noise control. We see no reason why the District may not adopt standards to protect the general public that are drawn from other agencies whose concern is, as in OSHA, a more limited constituency.

### IV. Worman's Equal Protection and Equal Privileges Rights

■ Worman also objects to certain provisions of the permit arguing that these provisions violate its rights under the equal protection clause of the United States Constitution and the equal privileges provision of the Indiana Constitution. Quoting *Phelps v. Sybinsky*, 736 N.E.2d 809, 818 (Ind.Ct.App.2000), *trans. denied*, that states, "The equal protection clause

guarantees that similar individuals will be dealt with in a similar manner by the government," Worman argues that because certain conditions of its permit are not identical to counterpart provisions in other permits issued by the District, a genuine issue of material fact exists as to whether the District has violated its rights under the Equal Protection Clause of the United States Constitution. Worman's argument misses the point. In the same paragraph of *Phelps* cited by Worman, the Indiana Court of Appeals went on to explain that the Equal Protection Clause "does not reject the government's ability to classify persons or 'draw lines' in the creation and application of laws, but it does guarantee that those classifications will not be based on impermissible criteria or arbitrarily used to burden a group of individuals." *Id.* Essentially, disparate treatment by the government, unless involving protected classes of individuals, must have a rational basis.

Many of Worman's equal protection arguments fail because Worman has not shown any actual disparate treatment. For example, Worman argues permit condition A.4, which requires documentation of the flow of material through the facility, has not been included in other permits issued by the District. The District responded that substantially similar provisions have been included in other permits. In fact, some contain the exact language used in Worman's permit. Condition C.7 requires Worman to document that it has recorded the permit for a clean fill processing and recycling facility in the Recorder's Office. The only difference between this provision in Worman's permit and similar provisions in other permits cited by the District is the designation of the facility as a clean fill and recycling facility. The other facilities are different types of facilities and they are so designat-

ed. Condition D.3 of Worman's permit requires Worman to control odor and condition D.5 requires it to control litter. The District again points out that other permits it has issued contain the same or substantially similar terms.

Worman also argues generally that other permits for clean fill facilities do not provide specific guidelines with respect to fire, dust, odor, or noise, but instead are more generally required to address any nuisance created. Worman is correct that it has been treated differently than other permittees, but the permits to which Worman points were issued before passage of Resolution 98–3. Nothing in the Equal Protection Clause precludes government from imposing new requirements. *City of New Orleans v. Dukes,* 427 U.S. 297, 304, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (failed equal protection challenge to a grandfather clause that exempted certain businesses from new regulations). Worman also points to permits for similar facilities that do not require a closure plan, as required by Worman's permit. The District explains that the other facilities at issue either do not accept organic materials or bury them, so the facilities do not create the fire hazard presented by Worman's facility. Finally, Worman argues that other permits do not contain Worman's exceptions for asphalt and dimension lumber. But those exceptions are based on Worman's permit application. All of these differences are grounded in a rational basis.

A separate analysis is required under the Equal Privileges Clause of the Indiana Constitution, but we reach the same result.

> Article 1, Section 23 of the Indiana Constitution imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons. First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Collins v. Day,* 644 N.E.2d 72, 80 (Ind. 1994).

Worman has failed to show disparate treatment in many of the permit conditions, so the Equal Privileges Clause analysis ends for those conditions. As to the others, the different treatment accorded Worman is reasonably related to differences between Worman's facility and the other permittees. As a result, Worman has failed to raise a genuine issue of material fact supporting its claim that its Equal Protection or Equal Privileges rights have been violated.

### Conclusion

We affirm the trial court's grant of summary judgment.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.