**CALVARY TEMPLE CHURCH, INC., Appellant–Defendant,**

v.

**Paul E. PAINO and Paul C. Paino, Appellees–Plaintiffs.**

No. 02A03–0407–CV–340.

Court of Appeals of Indiana.

May 11, 2005.

Cathleen M. Shrader, Barrett & McNagny LLP, Fort Wayne, IN, Attorney for Appellant.

Karen T. Moses, Baker & Daniels, Fort Wayne, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Calvary Temple Church ("CTC") appeals the grant of summary judgment to its former pastors, Paul E. Paino and his son Paul C. Paino, in a dispute over the pastors' pensions. Under the substituted contract doctrine, CTC's Constitution—an enforceable contract between CTC and its members—prevails over Paul E.'s and Paul C.'s individual pension contracts signed before the enactment of the church constitution; thus, the trial court did not err in refusing to enforce the individual pension contracts. In addition, because the case did not involve the interpretation of any ecclesiastical doctrine, the trial court did not err in hearing and deciding the case. For these reasons, we affirm.

### Facts and Procedural History

Paul E. founded CTC, an independent, non-affiliated church, in Fort Wayne, Indiana, in 1956. CTC is a not-for-profit

religious corporation.[1] During his tenure with CTC, he held various titles in the church such as pastor, senior pastor, and bishop. In 1970, Paul C. joined the pastoral staff of the church and throughout the course of his affiliation with the church held various titles including pastor, co-pastor, and senior pastor.

In the summer of 2000, CTC began to experience a great deal of turmoil and dissention centering upon rumors that Paul C. was having an inappropriate relationship with a female employee of the church who was also a member of CTC. Apparently Paul C. and the employee/member had met alone, which was contrary to the principles of CTC that prohibited a pastor from meeting alone with a member of the opposite sex. Additionally, at one meeting that took place at a local restaurant both Paul C. and the employee/member consumed alcohol, which also violated the principles of the church. Paul C. denied that the relationship was sexual, but he did admit that his "emotional involvement" in the relationship was "unhealthy." Appellant's App. p. A–277. Later that summer, Paul C. made a public statement to the congregation that he had compromised some principles, that he was sorry, and that he was working with a prayer group of men in the parish. This public statement did little to remedy the tumultuous atmosphere in the church and may have augmented it. Paul C. and his wife were divorced in March 2001. Paul C. resigned from the church on April 30, 2001; Paul E. separated from the church on May 6, 2001.

At the center of this case are the CTC Constitution and the pension agreements between CTC and Paul E. and Paul C.

CTC's Constitution evolved over the years and the amendments relevant to the current litigation occurred in 1981, 1988, 1992, and 2000. Pertinent to this litigation are the provisions in those constitutions that discussed retirement benefits and pension payments for the pastors, namely Paul E. and Paul C. Additionally, both Paul E. and Paul C. signed various agreements over the years with CTC titled either pension benefits, retirement benefits, or deferred compensation. Relevant provisions from CTC's Constitution and from the various agreements between Paul E. and CTC and Paul C. and CTC are reproduced below.

The 1971 Pension Contract between CTC and Paul E., which was signed by Paul E. and representatives of CTC and was notarized, stated as follows:

[I]n consideration of the premises and the services heretofore rendered by Pastor [Paul E.] and to be rendered by him in [sic] behalf of the Church, it is agreed that: ... (3) If Pastor [Paul E.] remains as Pastor of the Church until June 13, 1981, the Church shall pay him for life the sum of One Thousand Five Hundred Dollars ($1,500.00) per month whenever he voluntarily resigns, or because of ill health is unable to continue as Pastor ... or for any other reason his services are terminated as Pastor ..., after the date of June 13, 1981. It is further agreed that any notes, debts, bills, obligations, certificates, bonds, or salary that the Church may owe Pastor [Paul E.] for services rendered or money loaned will be paid in full to him by the Church within ninety (90) days of termination of his services as Pastor at any time after January 1, 1972. It is further agreed between the Church and Pastor

---

1. Title 23 (Business and Other Associations) of the Indiana Code defines a "religious corporation" as "a domestic corporation that is: (1) formed as a religious corporation under this title; (2) designated a religious corporation by another law; or (3) organized primarily or exclusively for religious purposes." Ind.Code § 23–17–2–25.

[Paul E.] that in the event of his incapacity ... [before] January 1, 1972, then and in such event and upon proof of such incapacity, this contract shall be in full force and effect ... and the ... retirement date ... shall be advanced to the date of such incapacity.

Appellant's App. p. A–353–54.

The 1976 Retirement Benefit Contract between CTC and Paul E., which was signed by Paul E. and representatives of CTC and was notarized, stated as follows:

1) Upon his retirement as Pastor–President of [CTC], [Paul E.] will continue to be paid on a monthly basis a sum which shall be equal to the salary which he shall have been receiving from [CTC] at the time of said retirement, said payments to continue until his death. 2) Upon said retirement, and in addition to any payments made to him under the provisions of paragraph (1) above, Pastor [Paul E.] shall be paid a monthly rental allowance equal to the rental allowance which he shall have been receiving from the Church at the time of his retirement, said payments to continue until his death. 3)[CTC] further agrees that any notes, debts, bills, obligations, certificates, bonds, or salary that the Church may owe to Pastor [Paul E.] for services rendered or money loaned by him to the Church will be paid in full to him by the Church within ninety (90) days of the termination of his services as Pastor, whether such termination be by reason of his retirement or for any other cause whatsoever. 4)[CTC] further agrees that the obligations to pay the retirement salary and the rental allowance ... are not contingent upon nor affected in any manner by any other income received by Pastor [Paul E.] from any other source.... 6) For his part, Pastor [Paul E.] agrees that he will continue his work as Pastor–President of [CTC], and will provide his best efforts on behalf of the Church and of the members thereof, and that in the event of his resignation ... that he will not accept a similar position with any other church within a 30–mile radius of Fort Wayne, Indiana....

*Id.* at A–230–31.

CTC's 1981 Constitution was signed only by Phillip C. Paino, son of Paul E. and brother of Paul C., as Secretary of CTC and was notarized. The Constitution and By-laws included in its "Finances" Article a section entitled "Pension Plan for Senior Pastor," which provided as follows:

A joint Committee consisting of the Directors and Elders of [CTC] have instituted a pension plan for the Senior Pastor with the following provisions: a. Senior Pastor and Founder, [Paul E.], on his retirement ... shall receive the same salary then in effect until his death. He shall also receive his rental allowance each month based on the amount of allowance at the date of retirement. b. It is the responsibility of [CTC] to provide this pension for [Paul E.] regardless of what his income is from any other source and is not to be affected by any other related Corporation which he has served. The pension plan of [CTC] shall be over and above and separate and different from the pension plan of any other Corporation. c. *Adoption of these By-laws constitutes ratification by the membership of such contract or pension.* d. Any future Pastor–President at his retirement shall receive one-half (1/2) of his salary until deach [sic] provided he has served this congregation for twenty (20) years or more. He shall receive three-fourths (3/4) of his salary at the time of his retirement until death provided he has

served the congregation twenty-five (25) years or more.

Appellee's App. p. 20–21 (emphasis added).

In December 1987, Paul E. retired as pastor of the church and began receiving pension benefits in January 1988. In January 1988, he became bishop of the church, and Paul C. was designated as a senior pastor. CTC's Constitution was also amended in 1988. The document had a signature line for the Assistant Secretary of CTC and also a signature line for a notary, but the document was neither signed nor notarized. The Constitution and By-laws included in its "Finances" Article a section entitled "Pension Plan for Senior Pastor" and a section addressing the retirement plan for future pastors. These provisions provided as follows:

A joint Committee consisting of the Executive Board . . . of Directors[ ] and the Elders of [CTC] have instituted a pension plan for the Senior Pastor with the following provisions: a. Senior Pastor and Founder, [Paul E.], on his retirement . . . shall receive the same salary then in effect until his death. He shall also receive his rental allowance each month based on the amount of allowance at the date of his retirement. b. It is the responsibility of [CTC] to provide this pension for [Paul E.] regardless of what his income is from any other source and is not to be affected by any other related Corporation which he has served. The pension plan of [CTC] shall be over and above and separate and different from the pension plan of any other Corporation. c. It is further approved that in the event of the death of [Paul E.], his surviving wife is to receive one-half (1/2) of the pension until she remarries or dies.

d. Adoption of these By-laws constitutes ratification by the membership of such contract or pension. e. Any future Pastor at his retirement shall receive one-half (1/2) of his salary until death provided he has served this congregation for twenty (20) years or more. He shall receive three-fourths (3/4) of his salary at the time of his retirement until death provided he has served the congregation twenty-five (25) years or more. Any amounts over and above this specified amount must be determined by the Executive Board . . . of Directors[ ] and the Board of Elders at the time of retirement.

Appellee's App. p. 46–47.

In December 1991, Paul C. and CTC entered a deferred compensation agreement. This 1991 agreement was signed by Paul C. and representatives from the church and was notarized. The agreement provided as follows:

WHEREAS, the parties desire to . . . enter into a new agreement for deferred compensation which will adequately address the future needs of both the Church and [Paul C.] . . . and . . . the parties hereto desire to bring the agreement between them into accord with the Constitution of the Church and specifically Article XIV, Section 4(e) [2] and clarify any uncertainties which may exist in said section. . . . 3. If [Paul C.] should leave the employment of the Church for any reason after the date of the execution of this Agreement and prior to his twenty-fifth (25th) anniversary of employment, at the later of age sixty-five (65), or his retirement from the church and for and during his natural life thereafter, [Paul C.] shall receive as deferred

---

**2.** The 1988 CTC Constitution, the version in effect at the time this agreement was enacted, does not contain an "Article XIV." *See* Appellee's App. p. 24–48. We observe, however, that Article VIII, Section 4(e) is the provision of the 1988 CTC Constitution that addresses payments to pastors other than Paul E. *See id.* at 46.

compensation, fifty percent (50%) of the average of his last three years annual salary ... which he received during said period immediately prior to his leaving the employment of the Church.... Should [Paul C.] complete twenty-five (25) years of service with the Church, and thereafter leave the employment of the Church for any reason after the date of the execution of this Agreement, at the later of age sixty-five (65) or his retirement from the church and for. and during his natural life thereafter, the Employee shall receive yearly, as deferred compensation, seventy-five percent (75%) of the average of his last three years annual salary.... It is agreed between the parties that this Agreement shall be governed by the laws of the State of Indiana.

Appellant's App. p. A–196–98.

In 1992, CTC's Constitution. was again amended. The document had a signature line for the Assistant Secretary of CTC and also a signature line for a notary, but the document was neither signed nor notarized. The provisions for the pension plan for the bishop (Paul E.) and senior pastor (Paul C.) provided as follows:

A joint Committee consisting of the Executive Board and the Elders of [CTC] have instituted a pension plan for the Senior Pastor and/or Bishop with the following provisions: (A) ... Bishop [Paul E.], on his retirement ... shall receive the same salary then in effect until his death. He shall also receive his rental. allowance each month based on the amount of allowance at the date of his retirement. (B) It is the responsibility of [CTC] to provide this pension for [Paul E.] regardless of what his income is from any other source and is not to be affected by any other related Corporation which he has served. The pension plan of [CTC] shall: be over and above and separate and different from the pension plan of any other Corporation. (C) It is further approved that in the event of the death of [Paul E.], his surviving wife is to receive one-half (1/2) of the pension until she remarries or dies. (D) Adoption of these By-laws constitutes ratification by the membership of such contract or pension. (E) Any future Senior Pastor and/or Bishop at his retirement shall receive one-half (1/2) of his salary until death provided he has served this congregation for twenty (20) years or more. He shall receive three-fourths (3/4) of his salary at the time of his retirement until death provided he has served the congregation twenty-five (25) years or more. Any amounts over and above this specified amount must be determined by the Executive Board and the Board of Elders at the time of retirement.

Appellee's App. p. 73. The most significant part of the 1992 Constitution for Paul C. was that, unlike the 1991 deferred compensation agreement, the 1992 Constitution's discussion of the pension plan for the senior pastor did not contain an age requirement to commence receiving pension benefits. Also in the 1992 Constitution, CTC included a provision stating that if a senior pastor "must be totally and finally removed from his office and ministry ... the church is to provide ninety (90) days salary as an expression of love and grace and concern for a fallen brother...." *Id.* at 66.[3]

On November 28, 2000, CTC's Constitution was amended once again and this time was signed by the Assistant Secretary for

3. In its Brief, CTC incorrectly asserts that this provision for the compensation of a removed pastor was added in 2000 amid the controversy surrounding Paul C.'s relationship with an employee of CTC. Appellant's Br. p. 11.

CTC and was notarized. *See* Appellee's App. p. 102. The provision in the 2000 constitution that addressed the pension plan for Paul E. and Paul C. was identical to the provision, quoted above, in the 1992 constitution. Paul C. retired as senior pastor effective December 1, 2000. He then began receiving his pension benefits, which were equivalent to 75% of his salary at the time of his retirement. In his letter announcing his retirement, Paul C. requested that he continue to serve as senior pastor, Appellant's App. p. A–315, and he also asked that should he continue as senior pastor, CTC would pay him 25% of his current salary in addition to his 75% pension, keeping his salary the same as before retirement. *Id.* CTC agreed to allow Paul C. to continue his role as senior pastor and to pay him the remaining 25% of his salary pursuant to the following resolution unanimously passed by CTC's Executive Board on the day before Paul C.'s retirement:

> [T]he Executive Board approves the remaining 25% of [Paul C.'s] current salary, as he will be receiving 75% of said amount in retirement, which in no way restricts any raises in salary approved by the Executive Board in the future; furthermore that this Board does not negate any benefits given to [Paul C.] by this Board in the past, i.e. time away for refreshment for him and his family. Furthermore let this motion show that the Executive Board supports [Paul C.] as our Senior Pastor.... Vote was taken by secret ballot, and this motion passed unanimously.

*Id.* at A–343.

Paul E. had received pension payments from CTC, in accordance with the Church's 1981, 1988, 1992, and 2000 Constitutions, from his January 1988 resignation as pastor until May 2001. In May 2001, the check from CTC was returned for non-sufficient funds, and Paul E. has not been paid by CTC since. Similarly, Paul C. was paid his pension benefits pursuant to the 2000 Constitution (whose pension provisions were identical to the 1992 Constitution) from the time of his retirement on December 2000 until May 2001.

When Paul E. announced his resignation from the pulpit on May 6, 2001, he simultaneously announced that he and Paul C. were founding a new church in Fort Wayne, Carroll Road Christian Fellowship Ministries ("Carroll Road"). As many as half of the members of CTC, all of the CTC office staff, and exactly half of CTC's Executive Board left to join Carroll Road. At the time that Paul E. and Paul C. left, CTC had accumulated $300,000 in outstanding bills, which were eventually paid by the remaining members of CTC.

In September 2001, Paul E. and Paul C. filed suit under separate cause numbers alleging that CTC's failure to comply with the pension provisions of the 1992 CTC Constitution and By-laws constituted a breach of contract. In September 2002, Paul E. and Paul C. both filed Motions for Summary Judgment. As to Paul E., CTC filed a Response to his Motion for Summary Judgment and a Cross–Motion for Summary Judgment and Alternate Motion to Dismiss for Lack of Subject Matter Jurisdiction. CTC's Cross–Motion for Summary Judgment alleged that Paul E. was in breach of his 1976 Retirement Benefit Contract because he established a competing church—Carroll Road—within thirty miles of CTC. As to Paul C., CTC filed a Response to his Motion for Summary Judgment and a Motion to Dismiss for Lack of Subject Matter Jurisdiction. Paul E. filed a Response to CTC's Cross–Motion for Summary Judgment, and Paul C. filed a Response to CTC's Motion to Dismiss.

In April 2003, the trial court heard argument on the summary judgment motions

only. In December 2003, the court granted Paul E.'s Motion for Summary Judgment and Paul C.'s Motion for Summary Judgment. The court denied CTC's Cross–Motion for Summary Judgment and Alternate Motion to Dismiss for Lack of Subject Matter Jurisdiction as to Paul E. and denied its Motion to Dismiss for Lack of Subject Matter Jurisdiction as to Paul C. CTC moved the trial court to certify its December 2003 orders for interlocutory appeal, and the trial court declined to do so. The parties presented the court with an "Agreed Judgment" for each case in which the parties agreed "solely on the issue of damages." [4] *See id.* at A–042, A–053. The trial court entered both Agreed Judgments. In July 2004, the parties filed a Joint Motion to Consolidate the Cases for Purposes of Appeal, which was granted by the trial court on the same day, and CTC timely appealed.

### Discussion and Decision

CTC raises two arguments on appeal. First, it argues that the trial court erred in granting summary judgment to Paul E. and Paul C. Second, it argues that the trial court lacked subject matter jurisdiction over both cases. We address each issue in turn.

### I. Motions for Summary Judgment

CTC argues that the trial court erred in applying the pension provisions as set forth in CTC's 1992 Constitution and By-laws.[5] According to CTC, both Paul E. and Paul C. were bound by their individual, signed pension agreements that were executed in 1976 and 1991 respectively. Moreover, CTC asserts that the trial court erred in failing to consider the responsibilities and expected conduct of bishops and senior pastors as set forth in CTC's Constitution in the trial court's determination of Paul E. and Paul C.'s right to pension benefits.

Our standard of review of a grant or denial of a motion for summary judgment is the same as the trial court's: summary judgment is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Worman Enters., Inc. v. Boone County Solid Waste Mgmt.*, 805 N.E.2d 369, 373 (Ind.2004). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.*

In granting summary judgment in favor of Paul E., the trial court explained that:

The Constitutions and By-laws, amended and ratified beginning in 1981, are ... the By-[l]aws of the non-profit Church. As such, these By-[l]aws are enforceable by the Court as between the corporation and its members.... As

---

**4.** As to Paul E., the Agreed Judgment called for a judgment of $426,981.30, plus monthly payments in the amount of $10,000 beginning July 1, 2004, and ending at Paul E.'s death. *See* Appellant's App. p. A–054. As to Paul C., the Agreed Judgment called for a judgment of $306,789.32, plus monthly payments in the amount of $7,185.02 beginning on July 1, 2004, and ending at Paul C.'s death. *See id.* at A–043. As security for the judgments, Paul E. was granted a second mortgage on CTC property, and Paul C. was granted a third mortgage.

**5.** The parties, without explanation, rely upon and cite to the 1992 Constitution, even though the 2000 Constitution was in effect at the time of the dispute. As was detailed in the "Facts" portion of this opinion, the 1992 Constitution was neither signed nor notarized, but the 2000 Constitution was signed and notarized. As a practical matter for the resolution of this dispute, the pension provisions in both the 1992 and 2000 Constitutions are identical, so our decision is the same regardless of which document we examine. Because the 2000 Constitution was in effect at the time the dispute arose, we will refer to the 2000 Constitution in our analysis.

these By-laws are a controlling contract between the corporation and its members, they can be enforced by the members and against the corporation. It therefore follows that [Paul E.], as a former member and employee of [CTC], can force the Church's By-laws as a contract between himself and [CTC].

Br. of Appellant p. 52 (citations omitted). In its grant of summary judgment in favor of Paul C., the trial court reasoned in a similar fashion:

Neither party debates the fact that at ... least [at] one time the [1991] Deferred Compensation Agreement was the controlling instrument between the parties concerning [Paul C.]'s pension benefits. However, the following year, the Church decided to amend its Constitution and By-laws.... It is clear through the pleadings of the parties and the various depositions proffered for consideration ... that the Church *did* ratify this 1992 Constitution and By-laws.... In addition, not only did the Church ratify the Constitution and By-laws, it actually recognized its duty to [Paul C.] under the pension provisions of the 1992 Constitution and By-laws and paid him between December, 2000 and April, 2001.

*Id.* at 65 (emphasis in original).

None of the parties set forth any genuine issues of material fact, thus the question before us is purely a matter of law. In this question of law, there are essentially two issues before us: first, the legal significance of a non-profit organization's constitution and by-laws, and second, the

proper resolution of an apparent conflict between the pension contracts Paul E. and Paul C. entered into with CTC and the later-enacted version of CTC's Constitution and By-laws.[6]

## A. Legal Significance of Corporation's Bylaws

 Indiana Code § 23–17–3–8(b) provides: "The bylaws of a corporation may contain any provision for regulating and managing the affairs of the corporation that is not inconsistent with any law or the articles of incorporation." This Court has addressed the significance of a corporation's bylaws on several occasions. We have consistently held that "[t]he articles of incorporation and bylaws of a nonprofit corporation constitute a contract between the state and the corporation, the corporation and its members, and the members among themselves." *Nat'l Bd. of Exam'rs for Osteopathic Physicians & Surgeons, Inc. v. Am. Osteopathic Ass'n,* 645 N.E.2d 608, 617 (Ind.Ct.App.1994); *see also Park Hoover Vill. Condo. Ass'n, Inc. v. Ardsley/Park Hoover Ltd. P'ship,* 766 N.E.2d 13, 17 (Ind.Ct.App.2002) (same), *reh'g denied;* *Brenner v. Powers,* 584 N.E.2d 569, 574 (Ind.Ct.App.1992) (same), *reh'g denied, trans. denied;* *Orchard Ridge Country Club, Inc. v. Schrey,* 470 N.E.2d 780, 782 (Ind.Ct.App.1984) (same). Indeed, CTC concedes that "under Indiana law, [CTC's] Constitution and By-laws form a contract between [CTC] and its members." Br. of Appellant p. 26. CTC, without citation to authority, then goes on to attack Paul E. and Paul C.'s right to

---

**6.** The parties use the terms "constitution" and "bylaws" interchangeably throughout their Briefs and the record materials presented to this Court. Neither party makes any argument that the "constitution" is anything more than the bylaws of this non-profit organization; as such, we will use the terms interchangeably and consider the so-called "Constitution and By-laws" to represent CTC's bylaws. *See, e.g., Supreme Lodge, K. of P. of the World v. Knight,* 117 Ind. 489, 495, 20 N.E. 479, 483 (1889) ("A constitution of a voluntary association or a corporation is nothing more than a by-law under an inappropriate name.").

enforce the contract because, although members, they did not sign the constitution. Nothing in our case law or the statutory scheme suggests that a member's signature on an organization's constitution or bylaws is a requirement for the provisions of the constitution or bylaws to be enforced by or against that member. We will not write such a requirement into the law. Consequently, we conclude that CTC's Constitution and By-laws constitute a contract between CTC and its members. This brings us to CTC's second issue—the resolution of the conflict between CTC's 2000 Constitution and Paul E.'s 1976 retirement benefit agreement and Paul C.'s 1991 deferred compensation agreement.

### B. Conflict Between Pension Contracts and CTC's Constitution/Bylaws

Paul E. and Paul C. both contend that the 2000 CTC Constitution's provisions on their pensions prevail over the pension contracts that Paul E. and Paul C. signed with CTC in 1976 and 1991 respectively. CTC asserts that both men are bound by their pension contracts, regardless of the language subsequently incorporated into CTC's Constitution. The practical effect is that if the 2000 CTC Constitution prevails, CTC will be bound to pay Paul E. approximately $10,000 per month and Paul C. approximately $7000 per month, *see supra* n. 3, for the remainder of their lives; if, however, the 1976 and 1991 pension agreements prevail, then Paul E. is owed nothing by CTC because he violated the 1976 agreement by establishing a church within thirty miles of CTC and Paul C. is owed nothing yet because he has not yet reached the age of sixty-five.[7]

■ The law recognizes two separate, yet closely related doctrines: substituted contract and novation. Indeed, the two doctrines differ only in the respect that a novation requires the existence of a new party who was not a party to the first contract; a noted treatise explains, "Novation is a species of substituted contract. . . . [T]he term 'substituted contract' is used when one or more of. the original parties but no new parties are involved in the transaction. The term 'novation' requires the presence of a new party." 13 Corbin on Contracts § 71.1(2), at 402 (rev. ed.2003).

■ Because in this case there was not a new party to the contract, the applicable doctrine is that of substituted contract, which has been defined as, "[a] contract made between parties to an earlier contract so that the new one takes the place of and discharges the earlier one." Black's Law Dictionary 349 (8th ed.2004). The Restatement (Second) of Contracts explains: "(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty. (2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." Restatement (Second) of Contracts § 279 (1981); *see also* 13 Corbin on Contracts § 71.1(3), at 407–08 (rev. ed.2003) ("As a general rule . . . the breach of the substituted contract does not revive the former discharged claim. The original claim is discharged immediately upon the making of the substituted contract.") (footnote omitted).

■ Indiana has previously adopted the principles of the substituted contract doctrine. As an example, in *Skaggs v. Merchants Retail Credit Ass'n,* 519 N.E.2d 202 (Ind.Ct.App.1988) we explained: "It is an

---

7. According to the record, Paul C. was born June 8, 1947, making him fifty-three years old when he resigned from CTC on April 30, 2001.

old rule in Indiana that where a contract embraces the entire substance of a former contract, with some variations, the first contract is merged in the second.... [A] written contract is presumed to embody all prior negotiations and agreements." *Id.* at 204; *see also McDonough v. Kane,* 75 Ind. 181, 184 (1881) ("As the contract ... was the last made between [the parties], and as it embraces the entire substance of the former contract, with some variations, the first contract must be held to be merged in the second."); Restatement (Second) of Contracts § 279 cmt. a (1981) ("If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract."). Although Indiana has implicitly adopted the principles of the substituted contract doctrine, we have never explicitly announced a test for it. However, another jurisdiction, in announcing a four-part test for a substituted contract, observed that this test is the same as the test for a novation because a novation and a substituted contract differ only in that a novation requires a substitution of parties. *Nat'l Am. Ins. Co. v. Hogan,* 173 F.3d 1097, 1105 n. 8 (8th Cir.1999) (applying Arkansas law). We agree that the test for a novation should be applied to the substituted contract doctrine.

■ Indiana's test for a novation, according to our supreme court, is: "(1) a valid existing contract, (2) the agreement of all parties to a new contract, (3) a valid new contract, and (4) an extinguishment of the old contract in favor of the new one." *See Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1233 (Ind.1994). Because novations and substituted contracts are essentially the same, we will apply Indiana's novation test to substituted contracts.

■ Applying the test to the case at hand, we find that all elements have been satisfied. As to the first element, CTC, Paul E., and Paul C. all acknowledge the existence and validity of Paul E.'s 1976 Retirement Benefit Contract and of Paul C.'s 1991 Deferred Compensation Agreement. Regarding the second element, the plain text of the 2000 Constitution states: "Adoption of these By-laws constitutes ratification by the membership of such contract or pension." Appellee's App. p. 100. Paul E. and Paul C. were members, and indeed leaders, of CTC and along with the other members of CTC, ratified the pension agreements; thus, all parties to the old retirement/deferred compensation contracts agreed to the new pension agreement. Moreover, "the express words need not always be present to indicate the assent to and acceptance of the terms of a novation; the intent may be implied from the facts and circumstances surrounding the transaction and the conduct of the parties thereafter." *Rose Acre Farms, Inc. v. Cone,* 492 N.E.2d 61, 68 (Ind.Ct. App.1986), *reh'g denied, trans. denied.* In this case, the parties were abiding by the pension provisions of the 2000 CTC Constitution until Paul E. and Paul C. left CTC. This is strong evidence of the parties' intent.

Concerning the third element, the parties are in agreement, consistent with Indiana law, that the 2000 Constitution is a valid contract between CTC and its members. Finally, the fourth element is satisfied by the language of the 2000 Constitution noting the "ratification by the membership of such contract or pension," Appellee's App. p. 100, and by the conduct of the parties in abiding by CTC's Constitution in the payment of Paul E. and Paul C.'s pensions. Nothing in CTC's Constitution's language regarding pensions suggests that the document could be anything other than an extinguishment of Paul E. and Paul C.'s old pensions in favor of a

new one as set forth in the unambiguous language of CTC's Constitution itself.

■ Having found that the language of CTC's 2000 Constitution is a substituted contract, we must now consider whether Paul E.'s and Paul C.'s pension benefits are contingent upon their following the religious tenets set forth in the 2000 Constitution. Essentially, CTC contends that Paul E. and Paul C. are not entitled to pension benefits because: (1) the division that resulted from Paul C.'s alleged inappropriate relationship; (2) Paul C.'s own admission that he had compromised his personal and the church's principles; (3) the fact that Paul E. and Paul C. are currently operating another church in Fort Wayne; and (4) the fact that CTC, as a religious organization that relies on the generosity of its members for financial support, is required to pay a significant amount of money—over $17,000 per month—to two former pastors who, in CTC's opinion, did not follow the principles of the organization during their tenure.

CTC, however, fails to recognize that the 2000 Constitution contains no requirements for a pastor's fidelity to church teachings or to other provisions of the church's constitution in order for that pastor to be entitled to pension benefits. In fact, the pension provision requires only that the pastor retire after a certain number of years of service to the church. In other words, the unambiguous, purely secular pension provisions of CTC's Constitution do not require the court to apply or interpret, any sections of the constitution that set forth the religious or doctrinal teachings of CTC. Based on this conclusion and on the fact that the CTC Constitution is the controlling document regarding the pension payments, we find no error in the trial court's granting of summary judgment to Paul E. and Paul C. or in the trial court's denial of CTC's Cross–Motion for Summary Judgment in Paul E.'s case.

## II. Motion to Dismiss

■ We now address the second of CTC's issues on appeal: whether the trial court erred in denying CTC's Indiana Trial Rule 12(B)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction. In arguing that the trial court lacked subject matter jurisdiction, CTC contended that this dispute was ecclesiastical and that a state court did not have jurisdiction over a religious dispute because the court could not decide the dispute without violating the Free Exercise Clause of the First Amendment. Before addressing the merits of CTC's argument, we briefly address the appropriate procedure.

In *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003), *cert. denied*, our supreme court held that "[a] court with general authority to hear matters like employment disputes is not ousted of subject matter … jurisdiction because the defendant pleads a religious defense. Rather, pleading an affirmative defense like the Free Exercise Clause may under certain facts entitle a party to summary judgment." *Id.* at 290. As such, the appropriate procedure would have been to treat CTC's 12(B)(1) Motion to Dismiss as a Motion under Trial Rule 12(B)(6) for failure to state a claim upon which relief can be granted. That motion would have necessarily been converted to a Motion for Summary Judgment under Trial Rule 56 because matters outside the pleadings were considered by the trial court in making its ruling. *See* Ind. Trial Rule 12. Our standard of review is *de novo*.[8]

8. As CTC points out in its Brief to this Court, the standard of review was not affected by the trial court's disposition of the motion under Trial Rule 12(B)(1) where the facts are not in

More pertinent to the instant case are the merits of CTC's argument that the trial court should not have entered this dispute because religious tenets were involved. CTC asserts that the trial court erred in not dismissing Paul E.'s and Paul C.'s complaints because the trial court had no authority to rule on an ecclesiastical dispute; according to CTC, this dispute concerns a minister's employment with his church. CTC contends that a secular court making a decision in this case would violate the church autonomy doctrine, which is a doctrine that "deals with a church's First Amendment right to autonomy in making decisions regarding [its] own internal affairs, including matters of faith, doctrine, and internal governance." *Brazauskas*, 796 N.E.2d at 293 (internal quotation omitted). When determining a court's authority to decide a case concerning a religious institution, courts must "not immunize every legal claim against a religious institution and its members. The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement." *Id.* at 294.

We cannot agree with CTC that this case involves an ecclesiastical dispute. Instead, the issue revolves around how many years the pastors worked for CTC. This fact does not require the invocation of any church doctrine—either the pastor did work the required number of years or he did not. The plain text of the pension provisions of the CTC Constitution does not require us to delve into Paul E.'s or Paul C.'s behavior, devotion to church beliefs, or effectiveness as pastors or bishops during the years they were employed. Their pensions were not contingent on such criteria. To discern their entitlement to their pensions, we must only determine that they were employed for the time period required, a fact that even CTC does not dispute. Because deciding this case required no intrusion upon the faith, doctrine, and internal governance of CTC, the trial court did not err in its decision to decide it.

Affirmed.

KIRSCH, C.J., and BAILEY, J., concur.

---

dispute and where there is no evidentiary hearing or under Trial Rule 56 where the material facts are not in dispute. Under both circumstances, our standard of review is *de novo. See, e.g., GKN Co. v. Magness,* 744 N.E.2d 397, 401 (Ind.2001) (holding that the appellate courts' standard of review on a trial court's 12(B)(1) motion to dismiss is *de novo* where the facts are undisputed); *Bennett v. CrownLife Ins. Co.,* 776 N.E.2d 1264, 1268 (Ind.Ct.App.2002) ("When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo.").