**Lyn LEONE, Omari Vaden, et al., Appellants/Plaintiffs,**

**v.**

**COMMISSIONER, INDIANA BUREAU OF MOTOR VEHICLES, et al., Appellees/Defendants.**

**No. 49A02-0804-CV-377.**

Court of Appeals of Indiana.

May 15, 2009.

Rehearing Denied July 29 and Aug. 6, 2009.

Kenneth J. Falk, ACLU of Indiana, Indianapolis, IN, Attorney for Appellants.

Gregory F. Zoeller, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BRADFORD, Judge.

Appellants/Plaintiffs Lyn Leone, Omari Vaden, *et al.*, ("the Class") appeal from the trial court's denial of their motion for a preliminary injunction against Appellees/Defendants the Commission of the Indiana Bureau of Motor Vehicles, *et al.*, ("the BMV").[1] The Class contends that it has satisfied all of the requirements for the grant of a preliminary injunction, while the BMV argues that the Class has satisfied none. Because we conclude that the Class has shown that the BMV's challenged policy violates constitutional guarantees of due process by failing to provide ascertainable standards, but that a preliminary injunction would not be in the public interest, we affirm the trial court's denial of the Class's request.

## FACTS AND PROCEDURAL HISTORY

Sometime in 2005, the BMV entered into an agreement with the Social Security Administration ("SSA") allowing the BMV to verify its records against those kept by the

1. Oral argument was held in this matter on December 16, 2008, in the Indiana Supreme Court Courtroom. We commend counsel on the quality of their oral presentations.

SSA.[2] (Appellant's App. 7). A series of checks performed in 2007 uncovered a number of BMV records that did not match records kept by the SSA. (Appellant's App. 9). Beginning in November of 2007, the BMV sent a series of three letters to, among others, persons whose names on file with the BMV did not match those on file with the SSA ("the Class").[3] (Appellant's App. 9–10). The first letters sent to the Class provided as follows:

> Dear NAME:
>
> One of the most important responsibilities we have here at the Bureau of Motor Vehicles (BMV) is safeguarding your personal information and identity. As a part of this responsibility, the BMV is joining 47 other states in verifying all customer Social Security Numbers directly through the Social Security Administration (SSA).
>
> Starting November 7, the BMV will be able to immediately verify the authenticity of a Social Security Number for anyone who applies for or renews an Indiana Driver license or identification card. This will serve as an additional safeguard to protect against identity theft.
>
> In preparation for this process, the BMV first had to verify all existing Social Security Numbers in our system. During the verification with the SSA, we received a message indicating your name in our records does not match what is on file with the SSA. This could have occurred because of a typographical error, the use of a nickname in one system and birth name in the other, name change due to marriage, or other reasons.
>
> We have provided three options for updating this information and request that you do so *within 30 days of the date of this letter.* Failure to update this information could result in the invalidation of your license or identification card. Those options are:
>
> 1. *Online—Visit www.mybmv.IN.gov/sslov to update this information electronically. You will need a driver license or identification card number and this PIN number [Insert PIN]. Please note that not all information can be updated electronically..*
> 2. *By mail—Complete the attached form and mail it to the Winchester Mail Processing Center, 309 West South Street, Winchester, IN 47394–2029.*
> 3. *Visit a license branch—Visit any Indiana BMV license branch with a certified copy of any appropriate court papers documenting your full legal name, along with your Social Security Card, a Numindent report issued by the SSA, or a verification letter from the SSA.*
>
> For more information regarding your Social Security Account, you may contact the Social Security Administration at 1–800–772–1213 or www.ssa.gov. Please note that the Indiana BMV is unable to answer questions related to Social Security Administration requirements.
>
> We appreciate your cooperation in this very important matter.

2. As of May of 2007, forty-six other states and the District of Columbia had entered into similar agreements with the SSA. (Appellant's App. 7).

3. Notices were also sent based on discrepancies based on gender, SSNs, birth dates, and birth date *and* gender. (Appellant's App.10). Persons sent notices based on discrepancies that were not name-related are not at issue in this case.

Appellants' App. p. 85 (brackets in original, bold removed from original, italics supplied).

The second letter, sent in December of 2007, provided as follows:

> Dear First Name:
>
> Recently you received a letter from the Indiana Bureau of Motor Vehicles (BMV) regarding our attempt to verify your Social Security Number with the Social Security Administration (SSA) in order to maintain accurate BMV records. During this process, we received a message indicating that your name listed in BMV records does not match what is on file with the SSA and must be updated immediately pursuant to Indiana Code §§ 9–24–9–2 or 9–24–16–3.5. If you have recently updated this information, please disregard this notice. We thank you for helping with this matter. If you have not updated your information, please note that if this is not resolved by Thursday, January 31, 2008, your driver license or identification must be invalidated.
>
> We have provided three options for you to update your information:
>
> 1. *Online—Visit www.mybmv.IN.gov/sslov to update this information electronically. You will need your driver license or identification card number and the PIN number [PIN number]. Please note that not all information can be updated electronically.*
> 2. *By mail—Complete the attached form and mail it to the Winchester Mail Processing Center, 309 West South Street, Winchester, IN 47394–2029.*
> 3. *Visit a license branch—Visit any Indiana BMV license branch with a certified copy of your birth certificate and any appropriate court papers documenting your full legal name.*
>
> For more information regarding your Social Security Account, you may contact the Social Security Administration at 1–800–772–1213 or www.ssa.gov. Please note that the Indiana BMV is unable to answer questions related to Social Security Administration requirements.
>
> We appreciate your cooperation in this very important matter.

Appellants' App. p. 90 (brackets in original, bold removed from original, italics supplied).

The third notice, sent beginning on February 25, 2008, provided as follows:

> Dear < >:
>
> You recently received two requests from the Indiana Bureau of Motor Vehicles (BMV) to update your personal information so that it matches the information on file with the Social Security Administration (SSA). As of the date of this notice, your personal information contained in BMV records still does not match the information on file with the SSA. Therefore, pursuant to Indiana law, your driving privileges will be revoked effective 3/12/08 *until your records are successfully updated, or the BMV receives a timely filed request for an administrative hearing as described below.*
>
> To validate your revoked credential, you must visit a BMV license branch and provide the proper documentation outlined in the letters that you received. A complete list of BMV license branches can be found at www.mybmv.in.gov <http://www.mybmv.in.gov>.
>
> If you believe this information is incorrect, you may request the BMV to review this order by mailing your written request for an administrative hearing, postmarked up to 18 days after the date

> of this notice. Please send the request to the following address: Bureau of Motor Vehicles, Legal Department, SSOLV Review, 100 North Senate Avenue, Room N440, Indianapolis, IN 46204–2214.

Appellants' App. p. 91 (italics supplied). As of April 8, 2008, 15,332 persons had received the third letter. (Appellant's App. 11).

Meanwhile, on February 8, 2008, the Class filed suit against the BMV, seeking to have the action certified as a class action, a declaratory judgment that the BMV's policy was unlawful, and a preliminary injunction against enforcement of the policy. (Appellant's App. 43–51). On April 9, 2008, the trial court certified the Class as "all persons who are currently threatened with invalidation of their BMV-issued drivers licenses or identification cards, or have had their licenses or identification cards invalidated, because there exists a discrepancy with their names on file with the BMV and their names on file with the Social Security Administration." Appellant's App. p. 75.

On April 11, 2008, the trial court held a hearing on the Class's request for a preliminary injunction. On April 23, 2008, the trial court denied the Class's request for a preliminary injunction, a denial from which the Class appealed, filing its notice of appeal the next day. (Appellant's App. 3–4). On October 7, 2008, the BMV filed Indiana Administrative Code Title 140, rule 7–1.1–2, which appears to embody the policy adopted in 2007 and provides in part as follows:

> An applicant for a new or renewed driver's license, permit, endorsement, or identification card must provide verifiable valid documentation to the bureau for identification purposes. An applicant's documentation information and Social Security number (SSN) presented to the bureau must match, based on the Social Security Administration's (SSA) criteria, the information that the SSA has in its records for the SSN.

The Class now appeals from the trial court's denial of its request for a preliminary injunction.

## DISCUSSION AND DECISION

### Whether the Trial Court Abused its Discretion in Denying the Class's Motion for a Preliminary Injunction

The Class contends the trial court abused its discretion in denying its motion for preliminary injunction against the BMV.

> The denial of a motion for preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion.
>
> When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. The trial court's judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them.
>
> We also determine whether the trial court's conclusions are contrary to law. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. Although we defer substantially to the trial court's findings of fact, we review questions of law de novo.
>
> In order to obtain a preliminary injunction, the moving party has the bur-

den of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant resulting from the granting of the injunction; and (4) the public interest would not be disserved. The movant must prove each of these requirements to obtain a preliminary injunction. If the movant fails to prove even one of these requirements, the trial court cannot grant an injunction.

The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor.

*Planned Parenthood of Ind. v. Carter,* 854 N.E.2d 853, 863 (Ind.Ct.App.2006) (citations and quotation marks omitted and paragraph formatting altered).

The Class contends that the BMV's policy violates Indiana and federal law, which, if true, would also relieve the Class of the burden of showing irreparable harm or that the balance of harms between the parties is in its favor.

> [W]here the action to be enjoined is unlawful, the unlawful act constitutes *per se* "irreparable harm" for purposes of the preliminary injunction analysis. When the *per se* rule is invoked, the trial court has determined that the defendant's actions have violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. Accordingly, invocation of the *per se* rule is only proper when it is clear that a statute has been violated.

*Short On Cash.Net of New Castle, Inc. v. Dep't of Fin. Inst.,* 811 N.E.2d 819, 823 (Ind.Ct.App.2004) (citations omitted).

## I. Whether the Policy is Illegal

### A. State Law Regarding Name Changes

The Class argues that the BMV violates Indiana law by essentially deferring to the SSA on the question of one's legal name, when the matter is purely one of Indiana law. The General Assembly has endowed the BMV with broad powers governing the issuance and regulation of driver's licenses and state identification cards. Pursuant to Indiana Code section 9–14–2–1, "The [BMV] commissioner shall [a]dminister and enforce ... this title and other statutes concerning the bureau ... and ... the policies and procedures of the bureau[, and o]rganize the bureau in the manner necessary to carry out the duties of the bureau." "The bureau may issue all permits and licenses required by law for the operation of a motor vehicle in a manner the bureau considers necessary and prudent." Ind.Code § 9–24–11–2. Moreover, "Upon any reasonable ground appearing on the records of the bureau, the bureau may ... [s]uspend or revoke the current driving license of any person." Ind.Code § 9–30–4–1. As for identification cards, the BMV has the authority to "temporarily invalidate an identification card that it believes to have been issued as a result of fraudulent documentation." Ind.Code § 9–24–16–2.

We conclude that the BMV's policy, as embodied in Indiana Administrative Code Title 140, rule 7–1.1–2, does not violate Indiana law. The Class cites to no authority that explains why requiring a person to

update information with the SSA or BMV violates Indiana law in any way, nor are we aware of any. We are unwilling to essentially invalidate the BMV's program without clear authority that it has somehow violated Indiana law. The burden was on the Class to establish a clear violation of Indiana law, and it has not done so.

While we agree that it is the law of Indiana that a person can change his or her legal name without resort to formal legal process, it does not follow that all others, including governmental agencies like the BMV, are required to simply accept the word of the applicant that he is who he claims to be. In other words, the ability to change one's name at will does not equate to freedom from all of the consequences of such a decision. In our view, the public interest in curtailing identity theft shifts the burden and inconvenience to the person seeking to change his name.

We find ourselves in full agreement with Justice Prentice's views on this point, which are consistent with English and American common law[4] and were expressed as follows:

> It is not only the individual who must be concerned with his name. The state, its institutions and society in general must also deal with it....
>
> There is no constitutional or inherent right to compel legal sanction of a change of name, notwithstanding the right at common law to assume a new name so long as it is not for a fraudulent or illegal purpose. The mere assumption of a different name, as opposed to legal sanction thereof, casts little if any burden upon others, because others are free to recognize it or not, as they wish. This is not the case when the change has been given the sanction of a court decree.

*Petition of Hauptly*, 262 Ind. 150, 156, 312 N.E.2d 857, 861–62 (1974) (Prentice, J., dissenting). In short, we believe that the public interest in preventing identity theft requires that one must bear the consequences, including the inconveniences, of changing one's name.

Moreover, the Class's suggested interpretation of the statutes governing the BMV would lead to what we consider to be a result not intended by our legislature.

> The interpretation of a statute is a question of law for the courts and is reviewed under a *de novo* standard. The rules of statutory construction require courts to give the words of a statute their plain and ordinary meaning unless the statute otherwise provides definitions, or unless the construction is plainly repugnant to the intent of the legislature. However, if a statute is susceptible to more than one interpretation, it is ambiguous. If a statute is ambiguous, then courts must give effect, and implement the intent of

4. As regards the surname * * *, custom has universally decreed that a man shall be known by the name of his father. But in England and the United States, at least, this custom is not legally binding; there is no law preventing a man from taking whatever name he has a fancy for, nor are there any particular formalities required to be observed on adopting a fresh surname; but, on the other hand, if a man has been known for a considerable time by the name of his father, or by a name of repute, and he changes it for another, he cannot compel others to address him or designate him by the new one. Neither does the English law recognize the absolute right of any person in any particular name to the extent of preventing another person from assuming it. If, however, a person adopts a new name and wishes to have it publicly notified and recognized in official circles, the method of procedure usually adopted is that by royal license.

*Application of Dengler*, 287 N.W.2d 637, 639 n. 1 (Minn.1979) (citations omitted).

> the legislature. In doing so, courts must examine the whole statute and not give too much meaning to any particular word or words in isolation, but should extract the purpose of the legislation and avoid an unjust or absurd result.

*Ind. Bureau of Motor Vehicles v. Orange,* 889 N.E.2d 388, 390 (Ind.Ct.App.2008) (citations and quotation marks omitted).

Taking all of the relevant statutes into account, we conclude that implicit in the broad statutory authority granted to the BMV is the power to verify the information submitted to it by an applicant for a driver's license or identification card by any reasonable method. As previously mentioned, the BMV has the power to revoke a license on any reasonable ground, and the failure (or refusal) of a cardholder to establish his or her identity seems eminently reasonable to us, even if that means using federal records. By taking away the BMV's power to verify the information given to it using the SSA standard it has chosen, the Class's position on this question would effectively eviscerate the statutory provisions granting the BMV broad powers in this area. In summary, we conclude that the policy does not violate Indiana law by using the SSA's database to verify the information supplied by applicants.

### B. Due Process

This is not to say, however, that the BMV's policy does not run afoul of some other body of law. Once a driver's license is issued, the person issued the license has a property interest in it, and it cannot be taken away without due process. *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that ... due process required by the Fourteenth Amendment."). The Class alleges two distinct due process violations, contending that the BMV has acted without ascertainable standards and that the program at issue is without a rational basis. We agree with the Class regarding the first claim, but not the second.

#### 1. Ascertainable Standards

"[I]n order to satisfy due process, ... administrative decision-making must be done in accordance with previously stated, ascertainable standards." *Ind. Dept. of Envtl. Mgmt. v. AMAX, Inc.,* 529 N.E.2d 1209, 1212–13 (Ind.Ct.App.1988). "The standards should be written with sufficient precision to give fair warning as to what the agency will consider in making its decision." *Id.* "Ascertainable standards provide those persons having potential contact with the administrative body with fair warning of the criteria by which their petitions will be considered." *Id.*

The Class contends that the policy at issue was implemented without any "regulations or formal rules indicating how and why residents' entitlement to a license or identification card is now linked to SSA records." Appellants' Br. p. 21. It seems to us, however, that this argument is misplaced. The administrative action at issue here is not the implementation of the policy, but, rather, the possible revocation of the license or identification card. During the process of formulating the policy, after all, there are no "petitions" before the BMV, as there would be if a person were attempting to resolve a discrepancy.

In any event, we conclude that the BMV has, in fact, failed to articulate ascertainable standards for current license and identification card holders, and the policy therefore fails to comport with the require-

ments of due process. Nowhere in the first two letters is the concept of "updating" information with the BMV explained. Therefore, one does not know whether the BMV's information must be made to match the SSA's (or vice versa) or whether the discrepancy may remain if it is adequately explained. Moreover, the notices are not even consistent with one another. Class members are told in the first letter that one way to update information is to visit a BMV license branch "with a certified copy of any appropriate court papers documenting your full legal name, along with your Social Security Card, a Numindent report issued by the SSA, or a verification letter from the SSA." Appellant's App. p. 85. In the second notice, however, class members are told to bring "a certified copy of your birth certificate and any appropriate court papers documenting your full legal name." Appellant's App. p. 90.[5] These two statements are both phrased as requirements but are inconsistent, leaving one to wonder which, if either, is correct. The third notice informs the class members of the availability of an administrative hearing, but makes no mention of what types of evidence might suffice. Again, one is given the impression by the first two notices that certain documents were absolutely required, but the provision for a hearing strongly suggests that testimony would also suffice, at least in some cases.

Finally, we believe that the rule promulgated by the BMV after this litigation commenced only serves to increase the confusion. First, as previously mentioned, the rule, by its own terms, does not even clearly apply to the class members, who are existing license and identification card holders, although we conclude that the BMV likely intended it to. Additionally, the rule clearly indicates that only a match between BMV and SSA records will be sufficient, which contradicts suggestions in the notices that a discrepancy could be explained, rather than rectified, or that testimonial evidence regarding identity could suffice in some cases. In short, class members are given no clear indication regarding how their individual cases will be evaluated and no clear instruction on how they might avoid the revocation of their licenses or identification cards. So, while we conclude that the BMV can require and is requiring a match between its information and SSA's, we believe that the BMV has failed to give the class members fair notice regarding this requirement.

### 2. Rational Basis

Even though we believe that the BMV has failed to provide ascertainable standards, we do not accept the Class's argument that the policy lacks a rational basis. "Substantive due process prohibits state action which deprives one of life, liberty or property without a rational basis for the deprivation." *Stewart v. Ft. Wayne Cmty. Schools*, 564 N.E.2d 274, 279 (Ind.1990). "Where the basis for such state action is so lacking as to make it 'arbitrary and capricious,' courts will invalidate the action as violating substantive due process." *Id.* at 279–80.

The question, then, is whether the presence of an unresolved discrepancy between BMV and SSA records is a rational basis for suspending or revoking a driver's license or identification card. We conclude that it is. In short, the policy effectively blocks a well-known avenue for identity theft by making it much more difficult to appropriate another's social security number in order to obtain state identification.

5. Unfortunately, neither the BMV website to which class members are directed in the first two notices nor the "attached form" mentioned in them are included in the record on appeal.

Moreover, although objective proof of the success of the program is unnecessary, all indications are that the program in question is in fact effective. Indianapolis Metropolitan Police Detective Eric Eads, the unit supervisor for the financial crimes unit who has extensive experience with identity theft, testified at the injunction hearing that, according to the BMV, the SSA records were the most accurate for identities. (Tr. 51). Detective Eads also testified that detection of fraudulent attempts to obtain state-issued identification had increased significantly since the program started, that the program assisted in the prevention of identity theft, and that granting the injunction request would hinder investigation of crime. (Tr. 34–38). Additionally, according to a stipulation of facts, as of May of 2007, forty-six other states and the District of Columbia were also verifying information through the SSA system, which we believe is a good indication of its effectiveness and rationality. (Appellant's App. 78). Were the preliminary injunction to be granted, none of these benefits would continue in the near term.

We have no dispute with the dissent's observation that the three named class members, Lyn Leone, Omari Vaden, and Catherine Goff, appear to be law-abiding citizens. Moreover, we do not deny that those three persons (and any other class members in similar situations) might be put to some effort by the BMV's policy. However, even though the three named class members apparently have no fraudulent intent, we must not lose sight of the fact that the BMV's system applies equally to those who *do* have such intent. As of April 8, 2008, the BMV had sent 15,332 persons final notices because their names as noted in BMV records did not match the names on file with the SSA. (Appellant's App. 11). Assuming that the percentage of resolved discrepancies is consistent for all types of discrepancies, approximately 3,000 persons had taken the trouble to correct their name discrepancies as of April 8, 2008.[6] (Appellant's App. 11). That leaves approximately 12,-000 unrectified licenses and identification cards. The record does not give any hint as to how many of these were originally obtained fraudulently, which is hardly a surprise, as the holder of such a document is not likely to complain too loudly when it is revoked. We recognize that it is theoretically possible that not one of the 15,322 licenses and identification cards at issue here was obtained through fraud, but there is certainly no evidence in the record that this is true, likely, or even plausible. In the end, though, the essential question is not how many criminals have been caught by the program, but how likely the program is to detect and prevent criminal behavior in the future. In today's climate of increasing identity theft, measures such as the BMV's program not only have a rational basis, but also what we believe to be proven effectiveness.

### II. Public Interest

Even though we are convinced of the lack of ascertainable standards in the BMV's policy, thereby relieving the Class of its burden of proving irreparable harm and that the balance of harms weighs in their favor, it must still establish that a preliminary injunction would be in the public interest. This it has failed to do. We conclude that an injunction in favor of the Class would clearly disserve the public interest in preventing and detecting identi-

6. As of April 8, 2008, 41,236 persons had been sent final notices regarding *all* discrepancies, and 8,422 of those, or approximately twenty percent, had resolved the discrepancies.

ty theft. Suspension of the BMV's program would have the effect of restoring a well-known avenue for fraud and identity theft. We simply cannot agree that the inconvenience of a few Hoosiers (which is really all the record before us shows) outweighs the very real threat that identity theft poses to all of us.

We would further point out that nothing in the record indicates that any of the three named plaintiffs (or any other member of the class, for that matter) has actually had a license or identification card wrongfully revoked.[7] Even if this were to happen, however, we fail to see how the affected persons would suffer any harm that would outweigh the public interest in preventing identity theft. We do not doubt that the loss of a driver's license or identification card could be highly inconvenient, but we imagine that, as a general rule, being the victim of identity theft would be far worse.[8] In our view, it seems clear that the potential harm to the public in the form of costs associated with detection, investigation, prosecution, and prevention of fraud and identity theft far outweighs the potential harm to the Class. We conclude that the Class has failed to establish that a preliminary injunction is in the public interest and affirm the trial court's ruling on that basis.

### Conclusion

We conclude that the BMV policy does not violate Indiana law by using the SSA's files to verify the accuracy of its own information and by requiring that individuals correct any discrepancies. We also conclude, however, that the policy fails to provide ascertainable standards and so violates the federal Constitution's guarantee of due process. Even so, we nevertheless affirm the trial court's denial of the Class's request for a preliminary injunction, as we conclude that it has failed to show that it would be in the public interest.

The judgment of the trial court is affirmed.

BAILEY, J., concurs.

RILEY, J., dissenting with separate opinion.

RILEY, Judge, dissenting with separate opinion.

I respectfully dissent. The majority has chosen to author its opinion without telling the factual history of the real people identified by the Appellants–Plaintiffs that are being hassled by the BMV's policy shift. Additionally, they have chosen to ignore Indiana law controlling administrative actions that an agency may not by its rules and regulations add to or detract from the law as enacted, nor may it by rule extend its powers beyond those conferred upon it by law. *Lee Alan Bryant Health Care Facilities, Inc. v. Hamilton,* 788 N.E.2d 495, 500 (Ind.Ct.App.2003), *clarified on reh'g,* 793 N.E.2d 229 (Ind.Ct.App.2003).

As of April 8, 2008, 15,332 persons were notified by the BMV that their names on the BMV records did not match their names on file with SSA and they were subject to revocation. Among those per-

7. Indeed, it would seem that Leone has already corrected her name discrepancy by updating her information with the SSA and continues to hold a valid Indiana driver's license. (Appellee's Brief 20).

8. We have assumed that all members of the certified class are in the same position as the three named plaintiffs seem to be, *i.e.*, persons who have legally changed their names without fraudulent intent. We doubt very much that this is truly the case, however. A person who had a fraudulently-obtained license or identification card revoked would, of course, not suffer any inconvenience that he did not deserve.

sons were Lynn Leone (Leone), Omari Vaden (Vaden), and Catherine Goff (Goff).

Leone is an adult resident of Indiana who has been licensed to drive as Lyn Leone for more than forty years. She was given the name Mary Lyn Leone at birth and this is the name listed on her birth certificate and Social Security records. However, since she became an adult she has consistently used the first name of Lyn. As a result she is an attorney admitted to the practice of law in Indiana under the name of Lyn Leone; she has consistently paid taxes under the name of Lyn Leone; she has bought and sold property under the name of Lyn Leone; all of her bank accounts and credit cards are maintained in the name of Lyn Leone, and she is registered to vote as Lyn Leone. There has been no suggestion that she uses the name Lyn for any fraudulent purpose. In September of 2007, Leone renewed her drivers license in the name of Lyn Leone. Her drivers license states that it is valid until 2011. Nevertheless, she was notified that her license was being terminated because the name on the license did not match that in the records of the SSA.

Vaden is an adult resident of Indiana. At birth he was given the first name of William. However, for more than twenty years he has used the first name of Omari. He has paid taxes as Omari Vaden, signed contracts as Omari Vaden, registered to vote as Omari Vaden, and used that name on his banking and financial records. There has been no suggestion that he changed his name for any fraudulent purpose. Vaden has never officially informed the SSA of his name change; however, his annual earning summaries from the SSA reflect that he has paid taxes as Omari Vaden.

Goff has been married for fifteen years and uses the surname of her husband, Michael Goff When Goff first obtained her license from the BMV after her marriage, she showed the BMV personnel her marriage certificate that proved she had married Michael Goff, and the BMV issued her a license in the name of Catherine Goff. Her current license is valid until 2012. She has now been informed by the BMV that her license is being terminated because there is an inconsistency between her name with the BMV records and the name associated with her SSN by the SSA.

The majority relies upon the testimony of Detective Eads to find a "rational basis" for the BMV's ultra vires acts. However, the law as codified by our legislature is that a person applying for a drivers license or identification card must provide the BMV with their "full legal name." *See* I.C. §§ 9-24-11-5(a)(1) and 9-24-16-3(b)(1). It has been the long standing law of our state that:

> a full name consists of one christian or given name, and one surname or patronymic. The two, using the christian name first and the surname last, constitute the legal name of the person. Any one may have as many middle names or initial as are given to him, or as he chooses to take; they do not affect his legal name.
>
> . . .
>
> No person is bound to accept his patronymic as a surname, nor his christian name as a given name, though the custom to do so is almost universal amongst English-speaking people, who have inherited the common law. A person may be known by any name in which he may contract, and in such name he may sue and be sued, and by such name may be criminally punished; and when a person is known by several names—by one as well as another—he may contract in either, and sue and be sued by the one in which he contracts, and may be punished criminally by either.

*Schofield v. Jennings,* 68 Ind. 232, 234–35, 1879 WL 5847 (1879). As such, Leone, Vaden, and Goff provided their "full legal names" to the BMV. If the BMV now thinks that in the day and age of identity theft that applicants for drivers licenses or identification cards should provide their name as it appears in the SSA database, then the BMV has the opportunity to approach our legislature and seek an amendment to Indiana Code sections 9–24–11–5(a)(1) and 9–24–16–3(b)(1).