ATTORNEYS FOR APPELLANTS
Kenneth J. Falk
Gavin M. Rose
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Frances H. Barrow
David L. Steiner
Deputy Attorneys General
Indianapolis, Indiana



FILED
Sep 10 2010, 1:23 pm

CLERK
of the supreme court,
court of appeals and
tax court



## In the
## Indiana Supreme Court

No. 49S02-0910-CV-505

LYN LEONE, OMARI VADEN,

*Appellants (Plaintiffs below),*

v.

COMMISSIONER, INDIANA BUREAU OF
MOTOR VEHICLES,

*Appellee (Defendant below).*

Appeal from the Marion Superior Court, No. 49D02-0802PL-6305
The Honorable Kenneth H. Johnson, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0804-CV-377

**September 10, 2010**

**Shepard, Chief Justice.**

The Bureau of Motor Vehicles notified almost 200,000 people that their driver's licenses and identification cards did not match their Social Security records. Within six months, more

than three-quarters of these people had somehow corrected the discrepancies. Appellants represent the subset of those remaining whose names did not match, about 15,000 people. They assert that the Bureau has overstepped its statutory authority by redefining the meaning of "legal name" to exclude anything but the name on file with the Social Security Administration. They sought a preliminary injunction, which the trial court denied. The trial court's conclusion that the class has not shown a likelihood of success was not an abuse of discretion, so we affirm.

## Facts and Procedural History

As the trial court found, in 2005 the Bureau of Motor Vehicles began using commercial databases to verify certain information received from individuals who applied for driver's licenses. That same year, the Bureau entered an agreement with the Social Security Administration for direct access to its records. The comparison procedure, used by at least forty-six other states and the District of Columbia, contains certain tolerances for minor inconsistencies such as transposed letters, extraneous letters, missing letters, and compound surnames. It also does not note an inconsistency where only an initial is provided for a first or middle name and the two surnames match exactly.

From May to October 2007, the Bureau compared its existing records with those of Social Security for verification. After receiving results from these comparisons, it sent letters to some 199,562 individuals with discrepancies in the person's name, gender, Social Security number, or birth date. The Bureau sent one of five letters depending on the nature of the inconsistency. The version sent to class members stated,

> we received a message indicating your name in our records does not match what is on file with the SSA. This could have occurred because of a typographical error, the use of a nickname in one system and a birth name in the other, name change due to marriage, or other reasons.

2

(App. at 36.) All five versions of this first letter stated that "[f]ailure to update this information could result in the invalidation of your license or identification card." (App. at 36–40.) The letters outlined three methods to update the information within thirty days: through the Bureau's website, by mail with an included form, or by visiting a license branch. (App. at 36–40.)

In the paragraph explaining the license branch option, the letter sent to Appellants instructs them to bring "a certified copy of your birth certificate and any appropriate court papers documenting your full legal name, along with your Social Security Card, a Numident report issued by the SSA, or a verification letter from the SSA."[1] (App. at 10, 36.)

In December 2007 the Bureau again checked its records against the Social Security Administration's. It then sent a second set of letters to about 117,370 individuals who still had discrepancies. Regardless of the nature of their discrepancies, these recipients all received the same letter, which repeated the three methods of complying and stated that if they chose to update their information by visiting a branch, they should do so "with a certified copy of your birth certificate and any appropriate court papers documenting you[r] full legal name." (App. at 10, 41.) They also stated that if the recipients had not updated by a certain date, "your driver license or identification card must be invalidated." (App. at 41.)

The Bureau sent a final notice beginning on February 25, 2008, which stated, "pursuant to Indiana law, your driving privileges will be revoked . . . until your records are successfully updated or the BMV receives a timely filed request for an administrative hearing as described below." (App. at 42.) The letter also said, "you may request the BMV to review this order by mailing your written request for an administrative hearing, postmarked up to 18 days after the

---

[1] A Numident report is "a computer extract of information from the original application for a Social Security card." Social Security Online – FOIA, Guide to Freedom of Information Act, http://www.socialsecurity.gov/foia/html/foia_guide.htm (last visited 4/21/2010).

date of this notice." (App. at 42.) Filing such a request would delay revocation until the administrative proceedings conclude, though the final notice did not so state.[2] As of April 8, 2008, the Bureau sent 41,236 people these final notices. Of these, 8,422 had resolved these discrepancies by that date.

After the Bureau distributed the second letter, Lyn Leone filed suit pursuant to Indiana law and 42 U.S.C. § 1983 on February 8, 2008. She also sought certification as a class action under Trial Rule 23(A) and (B)(2), a declaratory judgment that the Bureau's policy was unlawful, and a preliminary injunction against enforcement of the policy. Leone received one of the letters because her name appears as Mary Lyn Leone on her birth certificate and Social Security information, but she has used Lyn Leone all her adult life, including on her driver's license. (App. at 56–57.)

Two additional named plaintiffs subsequently joined the case. Omari Vaden has used his first name for twenty-five years, though his birth name is William Vaden. When Vaden first received an identification card from the Bureau, he completed an affidavit in which he swore he was not using the name Omari for fraudulent purposes. Vaden never notified Social Security of his name change, though he pays his taxes in the name of Omari Vaden, and his annual Social Security statements reflect this activity. The Bureau notified him that his identification card would be revoked because his name in its records does not match Social Security's records.

When appellant Catherine Goff married fifteen years ago, she adopted her husband's surname. Since then, she has consistently used the surname Goff. The Bureau issued Goff a license with that name. Her Social Security records show her name as Catherine Tabor, her

---

[2] The findings of fact state: "When the BMV receives the person's request for a hearing, the BMV tolls the start of the invalidation until the hearing is held and the administrative law judge makes a determination and issues their recommended order." (App. at 12.)

name during a previous marriage. Apparently, Social Security informed her that to change her name, she would have to produce her birth certificate, her divorce decree, and her marriage license. (App. at 64.) She and the clerk's office in the county in which she was divorced have been unable to locate the divorce decree.[3] (App. at 64.) The class added Goff when Leone received notice that the Bureau restored Leone's license.

The court certified the class as

> all persons who are currently threatened with invalidation of their BMV-issued drivers licenses or identification cards, or have had their licenses or identification invalidated, because there exists a discrepancy with their names on file with the BMV and their names on file with the Social Security Administration.

(App. at 75.)[4] The class represents 15,332 of the 41,236 final notice recipients, again relying on April 2008 figures, minus any who, like Leone, have somehow satisfied the Bureau since the notice.

After holding a hearing on the preliminary injunction, the court denied the class's motion on April 23, 2008. On interlocutory appeal, the Court of Appeals held that the BMV's policy was lawful and had a rational basis but that its procedures violated the class members' right to due process. Leone v. Indiana Bureau of Motor Vehicles, 906 N.E.2d 172, 175 (Ind. Ct. App. 2009).[5] It nevertheless affirmed the denial of a preliminary injunction, finding an injunction

---

[3] Goff's affidavit says, "the clerk's office has not been able to find the decree." (App. at 64.) While we take this as true for purposes of this appeal, a judgment entry may be prepared for judicial execution under Indiana Trial Rule 58 based on the chronological case summary.

[4] The court apparently certified the class after Goff became a named plaintiff. (App. at 64, 75, 93.)

[5] The Court of Appeals also granted Appellants' motion to grant a preliminary injunction as a stay, pending appeal, on June 18, 2008. Leone v. Indiana Bureau of Motor Vehicles, No. 49A02-0804-CV377, order (Ind. Ct. App. June 18, 2008). The order enjoined the Bureau from invalidating any of Appellants' drivers' licenses or identification cards if it had not done so by June 6, 2008.

would be against the public interest.  <u>Leone</u>, 906 N.E.2d at 175.  We granted transfer.  <u>Leone v. Commissioner-BMV</u>, 919 N.E.2d 556 (Ind. 2009) (table).

**Standard of Review**

We review a trial court's grant or denial of a preliminary injunction for abuse of discretion.  <u>Cent. Ind. Podiatry, P.C. v. Krueger</u>, 882 N.E.2d 723, 727 (Ind. 2008).

**The Class Has Not Shown the Elements Required for a Preliminary Injunction.**

To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence: (1) a reasonable likelihood of success at trial, (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action, (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction, and (4) the public interest would not be disserved by granting the requested injunction.  <u>Apple Glen Crossing, LLC v. Trademark Retail, Inc.</u>, 784 N.E.2d 484 (Ind. 2003).  Failure to prove any one of these requires denying the injunction.  <u>Id.</u> at 487–88.[6]

---

[6] Appellants invoke certain cases in which the Court of Appeals has held that where the action to be enjoined clearly violates a statute, the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant for purposes of the preliminary injunction analysis.  <u>Short on Cash.Net of New Castle, Inc. v. Dep't of Fin. Instits.</u>, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004); <u>Ferrell v. Dunescape Beach Club Condominiums Phase I, Inc.</u>, 751 N.E.2d 702, 713 (Ind. Ct. App. 2001).  This may or may not reflect sound injunction law.  Here, while the facts are uncontested, we cannot say the requirement that names match those with Social Security clearly violates the law, and instead proceed to review the

## Likelihood of Success

As movants, Appellants must show that they have a reasonable likelihood of success on the merits. Krueger, 882 N.E.2d at 727. They raise two issues that bear on their likelihood of success. First, they argue that the Bureau's requirement that their names should match those found on their Social Security documentation established a new requirement contrary to Indiana law. (Appellants' Br. at 15.) They argue that the Indiana Code requires the Bureau to use their legal names and that they have legally changed their names through a process recognized by common law. Second, they argue that the Bureau violated due process. (Appellants' Br. at 19–24.) They contend its failure to promulgate regulations or formal rules indicating how and why their licenses or identification cards are linked to the Social Security information violated their procedural due process rights. They say the Bureau's action does not rationally further a legitimate state interest in violation of their substantive due process rights. (Appellants' Br. at 22–24.)

Under Indiana statute, an application for an identification card issued before January 1, 2008, must be

> (1) Made upon an approved form provided by the bureau, which shall include the mailing address, and if different from the mailing address, the residence address of the applicant.
>
> (2) Verified by the applicant before a person authorized to administer oaths and affirmations.

---

standard proofs necessary for obtaining injunctive relief. Ind. Family & Soc. Servs. Admin. v. Walgreen Co., 769 N.E.2d 158, 162 n.3 (Ind. 2002).

7

Ind. Code § 9-24-16-2(a).[7]  An application for a driver's license or permit before January 1, 2008, required

> (1) The name, date of birth, sex, Social Security number, and mailing address, and, if different from the mailing address, the residence address of the applicant.

Ind. Code § 9-24-9-2(a).

> Applications for either type of document filed after December 31, 2007, must include

> (1) The full legal name of the applicant.
> (2) The applicant's date of birth.
> (3) The gender of the applicant.
> (4) The applicant's height, weight, hair color, and eye color.
> (5) The principal address and mailing address of the applicant.
> (6) A:
>> (A) valid Social Security number; or
>> (B) verification of an applicant's:
>>> (i) ineligibility to be issued a Social Security number; and
>>> (ii) identity and lawful status.

Ind. Code §§ 9-24-16-2(b), 9-24-9-2(b).

On November 5, 2008, the Bureau added 140 Indiana Administrative Code 7-1.1-1,[8] which included a definitions section that currently includes the following: "(t) 'Full legal name' means, pursuant to 6 CFR 37.3*, an individual's first name, middle name or names, and last

---

[7] Individuals whose identification cards were issued under this regime were not required to submit their Social Security numbers; therefore, they did not receive any notice that their cards might be invalidated. (Appellants' Br. at 23.)

[8] It did so under its authority in Indiana Code § 9-14-2-2: "The bureau may adopt and enforce rules under IC 4-22-2 that are necessary to carry out this title."

name or surname, without the use of initials or nicknames."[9]    20081105 Ind. Reg. 140080215FRA (Nov. 5, 2008); see 20091209 Ind. Reg. 140090169FRA (Dec. 9, 2009).

The Code requires the Bureau to maintain the information on the applications and authorizes it to "suspend or revoke the current driving license of any person" for "any reasonable ground appearing on the records of the bureau" or "invalidate an identification card that it believes to have been issued as a result of fraudulent documentation."  Ind. Code §§ 9-24-9-2(a)– (b), 9-24-16-2(b)–(c), 9-30-4-1.

On October 7, 2008, the Bureau filed 140 Indiana Administrative Code 7-1.1-2, which provided in part

> An applicant's documentation information and Social Security number (SSN) presented to the bureau must match, based on the Social Security Administration's (SSA) criteria, the information that the SSA has in its records for the SSN.

This rule was repealed on November 12, 2009.  20091209 Ind. Reg. 140090169FRA (Nov. 12, 2009).  Its replacement has a similar requirement:

> The applicant's SSN, or SSA documentation showing that the applicant does not qualify for an SSN, presented to the bureau must match the information that the SSA has in its records for the SSN or for the SSA documentation.

140 Ind. Admin. Code 7-1.1-3 (2010).

---

[9] The asterisk note reads "These documents are incorporated by reference."  This definition has since been amended to delineate by number each type of name, clarifying that initials and nicknames are not permitted on any of the three.

**The Common Law of Names and Name Changes**

Appellants argue that the common law allows name changes by common usage and that inasmuch as the Code requires the "full legal name" but does not define this term, the Bureau does not have authority to require that records match. (Appellants' Br. at 15–16.) They conclude that the Bureau must therefore use their commonly-used names. This series of contentions finds some resonance in case law:

> [A] State agency has the undoubted right to adopt rules and regulations designed to enable it to perform its duties and to effectuate the purposes of the law under which it operates, when such authority is delegated to it by legislative enactment. See Dep't. of Ins. v. Golden Rule Ins., 639 N.E.2d 339, 341 (Ind. Ct. App. 1994) (referring to administrative boards). An agency, however, may not by its rules and regulations add to or detract from the law as enacted, nor may it by rule extend its powers beyond those conferred upon it by law. Id. Any regulation that conflicts with statutory law is wholly invalid. Dep't of Pub. Welfare v. St. Joseph's Med. Ctr., 455 N.E.2d 981, 983 (Ind. Ct. App. 1983).

Lee Ann Bryant Health Care, 788 N.E.2d 495, 500 (Ind. Ct. App. 2003).

Appellants maintain that the Bureau unlawfully imposed a new requirement not listed in Indiana Code §§ 9-24-11-5(a)(1) and 9-24-16-3(b)(1), by redefining "full legal name." They argue that Indiana, following traditional common law, recognizes the name one commonly uses as one's legal name. Appellants essentially contend that in light of the absence of a stated definition, the statute incorporates the common law definition of a name. (See Appellants' Br. at 14–19.) The Bureau responds that its statutory responsibilities include verifying cardholders' names and that at common law people may change their names but are not entitled to require any third party "to recognize or sanction [common law] name changes." (Appellee's Br. at 17–18.) We therefore must consider how the common law treats names.

"The common law of England was derived from the universal usage and custom of the early English people, and is a system of jurisprudence founded upon principles of justice as it was conceived and administered by the English courts of law." Ketelson v. Stilz, 184 Ind. 702, 706, 111 N.E. 423, 424 (1916).

> From this common-law system, and from the usages, customs, and maxims upon which it is founded, innumerable rules and principles emanated, as the courts from time to time declared what they understood to be the correct law applicable to the matter before them, and such law was determined by a system of reasoning and of administering justice consistent with the universal usages, customs, and institutions of the English people.

Id. at 706, 111 N.E. at 424–25. So it was with the common law of names.

Before the Norman conquest, the inhabitants of the British Isles typically did not use surnames, let alone permanent names inherited from their fathers. G.S. Arnold, Personal Names, 15 Yale L.J. 227, 227 (1905–06); James C. Scott, John Tehranian, & Jeremy Mathias, The Production of Legal Identities Proper to States: The Case of the Permanent Family Surname, 44 Comp. Stud. Soc'y & Hist. 4, 11–14 (2002); Julia Shear Kushner, Comment, The Right to Control One's Name, 57 UCLA L. Rev. 313, 324–25 (2009). As Anglo-American societies grew more complex, producing more contact with government officials, larger populations, and new types of legal documents, the level of sophistication in the systems with which people identified ourselves also increased. See In re Reben, 342 A.2d 688, 690 (Me. 1975); Smith v. U.S. Casualty Co., 90 N.E. 947, 948–50 (N.Y. 1910). Circumstances, necessity, and time produced a set of customary practices. Ellen Jean Dannin, Proposal for a Model Name Act, 10 U. Mich. J.L. Reform 153, 156–59 (1976–77).

As courts faced various situations where a person's identity was in question, they "declared what they understood to be the correct law," thus expanding the rules governing names in the common law. See id. Indeed, Indiana's early jurisprudence features several examples which demanded the application of these common law rules. For instance, in Choen v. State, 52

11

Ind. 347 (1876), a criminal defendant was convicted of the assault and battery of a victim the indictment identified as "George W. Shott." On appeal the defendant argued that the evidence was insufficient because the proof showed that he had assaulted and beaten "George Shott." Id. at 348. This Court, citing several consistent historical opinions, applied the established rule that the "initial letter may be rejected as surplusage, and need not be proved." Id.

Again, in Schofield v. Jennings, 68 Ind. 232 (1879), this Court faced a scenario in which a defendant sought to avoid paying a note because the middle initial of the payee was different than that on the deed which originally conveyed the land to the payee. Id. at 234. In that case, we said,

> The purpose of a name is to identify the person. By the common law, since the time of William the Norman, a full name consists of one christian or given name, and one surname or patronymic. The two, using the christian name first and the surname last, constitute the legal name of the person. Any one may have as many middle names or initials as are given to him, or as he chooses to take; they do not affect his legal name; and they may be inserted or not, in a deed or contract, without affecting its legal validity. When two or more persons have the same name, proof is allowed, aliunde, to identify which person is meant, in any given transaction. No person is bound to accept his patronymic as a surname, nor his christian name as a given name, though the custom to do so is almost universal amongst English-speaking people, who have inherited the common law. A person may be known by any name in which he may contract, and in such name he may sue and be sued, and by such name may be criminally punished; and when a person is known by several names—by one as well as another—he may contract in either, and sue and be sued by the one in which he contracts, and may be punished criminally by either. And names which sound alike are held, in law, to be the same, though they may be spelled by different letters.

Id. at 234–35.

Schofield is exemplary of the common law cases in which American courts have faced the question of which name identifies a person. See 65 C.J.S. Names §§ 1–14, 20, 30–35 (2010). They typically involve rather technical disputes about formalities like initials or suffixes rather than credible disputes over identity. See 57 Am. Jur. 2d Name §§ 1–8, 16 (2001). Nevertheless, "the universal usages, customs, and institutions" of society reflected by these rulings include the ability to contract, sue, be sued, or be criminally prosecuted under any name the person may use. Schofield, 68 Ind. at 232; see Ketelson, 184 Ind. at 706, 111 N.E. at 425. It makes common sense that a contract entered under an assumed name obligates a person with just as much force as a contract entered under a name given at birth.

In such cases, the law does not concern itself with the nature of the person's name. Instead, what matters is the correctness of the identity of the person asserting or defending against filed claims. As Juliet mused that "Romeo would, were he not Romeo call'd, Retain that dear perfection which he owes Without that title," courts in these cases do not concern themselves with the name each party uses, as long as there is no actual (i.e., non-technical or formal) dispute about their identities. Even where actual identity is in dispute, courts consider names only to the extent they are necessary to identify someone. 65 C.J.S. Names § 29 ("Where identity is challenged on more than technical grounds, the parties must show that the person is or is not the same as the person alleged, and this becomes a part of a court's factual findings.").

Through deciding many such cases, courts eventually produced the following rule: under common law, a person may lawfully change his or her name without resort to any legal proceedings where it does not interfere with the rights of others and is not done for a fraudulent purpose. 65 C.J.S. Names § 20; 57 Am. Jur. 2d Name §§ 1–8, 16 (2001). A person effects a common-law change of name by usage or habit. 65 C.J.S. Names § 20. An individual's decision to use a name other than his or her birth name does not imply an intent to set aside his or her birth name or the identity associated with that name. Abdul-Jabbar v. General Motors Corp., 85 F.3d 407 (9th Cir. 1996); 65 C.J.S. Names § 30 ("There is a presumption that no one intends to

13

part with the right to use his or her own name."); 65 C.J.S. <u>Names</u> § 34 ("An intention of a person to part with the right to use his own name must be clearly shown.").

The very nature of a common-law name change means it does not require a court's approval. Such a system includes both the advantages of great flexibility and the disadvantage of the difficulty in verifying a name change, especially when the change occurs outside the traditional times in life, such as adoption, marriage, or divorce. <u>See</u> Ind. Code § 16-37-2-13 (2008); Ind. Code § 16-37-2-15; Ind. Code § 31-19-11-4 (2008); Ind. Code § 31-15-2-18.[10] Before 1851, one could acquire official state recognition of a name change by an act of Indiana's legislature. Indiana's 1851 constitution expressly abolished that practice. Ind. Const. art. 4 § 22. <u>See</u> Donald F. Carmony, <u>The Indiana Constitutional Convention of 1850–1851</u>, 11–12, 50, (Bethany L. Natali & Elizabeth R. Osborn, eds. 2009), (Master's Thesis, Indiana University 1931). Thus, in 1852 the legislature authorized courts to effect a change of name, providing a new procedure for "an orderly record of the change of name in order to avoid future confusion." 2 R.S. 1852, Ch. VII. §§ I–V (Gavin and Hord, eds., 1862 ed.). All states have enacted similar statutes, and all but two have concluded that they do not abrogate but instead supplement the common law.[11]

---

[10] Adopting parents may request a name change in a petition for adoption, and there appears to be no room for judicial discretion. Ind. Code § 31-19-11-4 (2008). A child born out of wedlock takes the mother's name or as directed in a paternity affidavit. Ind. Code § 16-37-2-13 (2008). If a child is born to unmarried parents, the child automatically takes the father's last name upon the parents' later marriage. Ind. Code § 16-37-2-15. "A woman who desires the restoration of her maiden name or previous married name must set out the name she desires to be restored to her in the petition for dissolution as part of the relief sought. The court shall grant the name change upon entering the decree of dissolution." Ind. Code § 31-15-2-18

[11] Massachusetts was a third state which abrogated common law for a time, but it has since joined the majority. Dannin, 10 U. Mich. L.J. at 162 n.63.

We addressed the question of whether Indiana's statute abrogated the common law in In re Hauptly, 262 Ind. 150, 312 N.E.2d 857 (1974). In that case, a married woman who had adopted her husband's surname at marriage sought a court order restoring her maiden name. The trial court in which she filed her petition denied it, and she appealed. Because the statute did not require petitioners to establish any reason for a name change, we interpreted it to include only the common-law restriction against adopting a name for fraudulent purposes. Id., 262 Ind. at 152–53, 312 N.E.2d at 859–60; see Ind. Code § 34-28-2-1 (2008). We therefore concluded that it was an abuse of discretion for the court to deny the woman's petition absent evidence of fraud. Hauptly, 262 Ind. at 153, 312 N.E.2d at 860.[12]

Certainly, Hauptly means that Indiana courts must grant a name change where no evidence of fraud exists, but this does not mean that the State must recognize an informal common-law name change. See id. at 152–53, 312 N.E.2d at 859. Only after a court grants this imprimatur to the name must a state agency recognize it. See Ind. Code § 34-28-2-5(a) (copy of a decree changing a name is sufficient evidence of that change in any court). Indeed, Justice Prentice dissented from Hauptly because he believed that the majority opinion for the first time required a court to grant legal sanction to any change of name allowed by the common law:

> There is no constitutional or inherent right to compel legal sanction of a change of name, notwithstanding the right at common law to assume a new name so long as it is not for a fraudulent or illegal purpose. The mere assumption of a different name, as opposed to legal sanction thereof, casts little if any burden upon others, because others are free to recognize it or not, as they wish.

---

[12] Unlike the common-law cases, the decisions interpreting name change statutes like Hauptly involve the question of the name change only, while in the common-law cases, some other controversy had to arise before a challenge to a name existed. For this reason, courts have apparently never determined whether a common-law name change requires another party, including the government, to recognize the name change without a court order.

<u>Hauptly</u>, 262 Ind. at 156, 312 N.E.2d at 862 (Prentice, J., dissenting). We think it correct to say that under the common law only a statutorily authorized court order gives legal sanction to a name change.

While the courts have a unique power to certify a name change, Hoosiers still may refer to themselves by any name they like. <u>See id.</u> at 152, 312 N.E.2d at 859 (majority opinion). They may not, however, demand that government agencies begin using their new names without a court order. This dual structure recognizes the reality that names serve multiple purposes, both private and public. Dannin, 10 U. Mich. J.L. Reform at 156, 160–70; Julia Shear Kushner, Comment, <u>The Right to Control One's Name</u>, 57 UCLA L. Rev. 313, 321. Among the private purposes are self-expression and identity, which are served by a person's ability to change one's name at will in social and informal settings. <u>See</u> Dannin, 10 U. Mich. J.L. Reform at 156, 160–70; Julia Shear Kushner, Comment, <u>The Right to Control One's Name</u>, 57 UCLA L. Rev. 313, 321. Among the public purposes are identification and communication, which are served by the State's ability to tether one's name to a fixed identifier. <u>See</u> Shear Kushner, 57 UCLA L. Rev. at 321.

The modern tendency toward use of government-issued identification in both private and public settings may shrink the field governed by the common law, but both common law and statutory processes have long coexisted with respect to names, as they do in other fields of law. Statutes obliging citizens to engage in some formality when they invoke government processes by applying for benefits or identification cards neither obliterate common-law usage nor are they driven by them.

**The Bureau's Statutory Authority**

As for whether the Code empowers the Bureau to hold to a definition of "legal name," the Bureau points out the requirement that cards contain full legal names, that holders must apply

for new cards within thirty days of a name change, and that the Bureau may "suspend or revoke the current driving license of any person" for "any reasonable ground appearing on the records of the bureau" or "invalidate an identification card that it believes to have been issued as a result of fraudulent documentation." (Appellee's Br. at 15 (citing Ind. Code §§ 9-24-9-2(b)(1), 9-24-13-4, 9-24-15-2(b)(1), 9-24-16-2(c), 9-24-16-7, 9-30-4-1).) Additionally, the Bureau has implicitly determined that a mismatch between its own and Social Security records "may be evidence of fraud." (Appellee's Br. at 15–16.)

The General Assembly required an application to include a person's name, birth date, and Social Security number, indicating it anticipated the Bureau might verify identities using these points of data. Ind. Code §§ 9-24-9-2; 9-24-16-2. The Social Security Administration is as logical an anchor as any to accomplish this end. In light of the section's requiring an application to include a Social Security number and the Bureau's responsibility to verify its records, there is no doubt that the statute allows the Bureau to use Social Security records to verify Appellants' identities. Ind. Code §§ 9-24-9-2; 9-24-16-2; see Ind. Code § 9-30-4-1.

If Appellants' position about the statute held sway, drivers could change their names through the common-law method and demand their license reflect that change without taking any formal actions with the agencies that maintain their records. Like it or not, the Social Security Administration has become the custodian of Americans' basic identifying information, and almost all state governments rely on this information to verify identities. (See App. at 7.) In light of this reality, the Bureau has logically decided to verify the identities of those with licenses and identification cards with the Social Security Administration. Because the General Assembly requires a name along with a Social Security number, the Bureau is within its authority to depend on Social Security to maintain Appellants' verifiable names. Appellants are not likely to succeed on the merits regarding their argument that to verify their identities by matching names exceeds its statutory authority.

**Due Process**

Appellants also argue that the Bureau has violated their procedural and substantive due process rights. (Appellants' Br. at 19–20.)

**Procedural Due Process—Ascertainable Standards**

A driver's license is a property right that cannot be taken away unless procedural due process is provided. Bell v. Burson, 402 U.S. 535, 539 (1971); Mitchell v. State, 659 N.E.2d 112, 114 (Ind. 1995). Due process requires such things as notice and an opportunity to be heard, but Appellants here argue that the Bureau fell short on its requirement that government decisions be made pursuant to ascertainable standards. (Appellants' Br. at 20.)

Due process requires that standards should be written with sufficient precision to give fair warning as to what the agency will consider in making its decision. Worman Enters., Inc. v. Boone County Solid Waste Mgmt. Dist., 805 N.E.2d 369, 378 (Ind. 2004). In assessing whether a standard is sufficiently ascertainable to withstand a challenge for vagueness, we determine if it is so indefinite that persons of common intelligence must necessarily guess at its meaning and differ as to its application. Id.

Appellants contend that the policy at issue was implemented without any "regulations or formal rules indicating how and why residents' entitlement to a license or identification card is now linked to SSA records." (Appellants' Br. at 21.) The Bureau responds that the statute already requires applicants to provide accurate names and Social Security numbers and requires the Bureau to maintain accurate records. (Appellee's Br. at 20.)

As we have already noted, the Code requires the Bureau to maintain accurate records and to collect Social Security numbers, putting Appellants on notice that their records could be

scrutinized based on Social Security's records and their documents revoked. Furthermore, in addition to existing regulations and statutes, the Bureau distributed the letters between November 2007 and February 2008 asking their recipients to reconcile their records. These letters provided additional descriptions of what the Bureau requires.

While these letters did not outline the steps required to "update" Appellants' records, they did provide forms—both online and enclosed in the letter—to do so. Further, while they did not direct Appellants about which records to alter—the Bureau's or Social Security's—this presumably was to give the recipient discretion over his or her recorded name rather than requiring a change to one or the other. The first letter makes clear that the issue arose because the names the Bureau had on file did not match Social Security's records, meaning changing one to match the other would remedy the problem. The second letter stated that the recipient's records "must be updated immediately pursuant to Indiana Code §§ 9-24-9-2 or 9-24-16-3.5," which list what is required on an application for a license or card. (App. at 41.)

The letters also stated that the discrepancy between the two records could not remain. The first letter informed recipients that "your name in our records does not match what is on file with the SSA," and required them to "update this information" to resolve the discrepancy. (App. at 36.) The second letter reminded recipients that "your name listed in BMV records does not match what is on file with the SSA and must be updated immediately pursuant to Indiana Code §§ 9-24-9-2 or 9-24-16-3.5." (App. at 41.) The third letter reminded recipients of the "two requests from the Indiana Bureau of Motor Vehicles (BMV) to update your personal information so that it matches the information on file with the Social Security Administration (SSA)." (App. at 42.) Although the letters do not go into great detail about what "updating" one's information would require, all three letters clearly communicate that the required resolution was for the information held by the Bureau and Social Security to match.

As for communicating the consequences of not updating the information, the first letter stated that failure to update "could result in the invalidation of your license or identification

card." (App. at 36.) The second stated failure to comply would mean that the card "must be invalidated." (App. at 41.) The final notice stated "your license will be revoked effective" a specified date. (App. at 42.) Though not identical, these all make clear that without a resolution to the discrepancy between the records, the Bureau would likely revoke the license or identification card.

The first two letters contained different language regarding the required documentation to update records with the Bureau. (App. at 36, 41.) The first letter received by Appellants told them to bring "a certified copy of your birth certificate and any appropriate court papers documenting your full legal name, along with your Social Security Card, a Numident report issued by the SSA, or a verification letter from the SSA." (App. at 10, 36.) The second letter said to visit a branch "with a certified copy of your birth certificate and any appropriate court papers documenting you[r] full legal name." (App. at 10, 41.) The Bureau sent this second letter to a more general list of recipients, so the description is less specific. (App. at 10.) Although it describes the appropriate documentation as "court papers," someone who received the first letter, as all the Appellants did, would have a respectable idea of what documentation would suffice.

Taken together, the first two letters indicated what the recipients needed to show, and they provide other sources for any clarification they might require. The final notice, which required a visit to a license branch, similarly referred back to these two letters in describing the necessary proof with "the proper documentation outlined in the letters that you have received." (App. at 42.) The final notice also notified Appellants of their right to appeal through an administrative hearing.[13] (App. at 42.) Nevertheless, a person could presumably show the

---

[13] Of the two remaining named plaintiffs, only Goff took this step. The Court of Appeals entered a stay preventing the revocation of licenses and identification cards belonging to Appellants who filed administrative appeals until this question is resolved. Leone, No. 49A02-0804-CV377, order (Ind. Ct. App. June 18, 2008).

20

documentation listed in the first letter to prove that Social Security and Bureau records actually did match.

**Substantive Due Process—Rational Advancement of Legitimate State Interest**

Substantive due process ensures that state action is not arbitrary or capricious regardless of the procedures used. Kellogg v. City of Gary, 562 N.E.2d 685 (Ind. 1990). In setting forth a claim, a party must show either that the law infringes upon a fundamental right or liberties deeply rooted in our nation's history or that the law does not bear a substantial relation to legitimate state interests. Washington v. Glucksberg, 521 U.S. 702 (1997).

Appellants do not assert that driving is a fundamental right. (Appellants' Br. at 22–23.) See Mitchell v. State, 659 N.E.2d 112, (Ind. 1995) ("Neither this Court nor the United States Supreme Court has ever held driving to be a fundamental right."). Instead, they argue that the Bureau's action does not rationally further a legitimate state interest. They argue that "no Indiana or federal law . . . states that an Indiana resident's legal name is what is in the records maintained by the SSA" and that it is "irrational to redefine legal name . . . to be the name appearing on social security records." (Appellants' Br. at 23.) Appellants further claim that the system the Bureau established irrationally does not recognize one's legal name "and would not recognize any name change, even one that was the product of a formal court sanctioned name change, or divorce decree, or marriage, unless the name change is first recorded with the SSA." (Appellant's Br. at 24.)

The Bureau responds by pointing out that the requirement of a legal name is only one of twelve requirements for an application for a driver's license. (Appellee's Br. at 23 (citing Ind. Code § 9-24-9-2(b)).) Another is the applicant's Social Security number. Ind. Code §§ 9-24-9-2; 9-24-16-2.

21

We agree with the trial court that "[t]he State of Indiana, through the BMV, has legitimate interests in both the integrity of its records and in protecting its citizens against fraud and identity theft." (App. at ¶ 50 (citing Mitchell, 659 N.E.2d at 116).)

As we have already indicated, one's legal name does not have a stable or undisputed definition. As such, the Bureau has not redefined "legal name." It simply seeks to verify a person's identity by requiring federal records to match. Instead of taking on the task of maintaining citizens' names, it has relied on the government agency most widely used for such purposes. If one would like to use another name on one's license, one need only seek such a change with the Social Security Administration before the Bureau. Social Security's public website appears to indicate that a decree from an Indiana court would provide sufficient evidence of the change for its purposes. Social Security Online Program Operations Manual System (POMS), RM 00203.210 Changing Numident Name Data https://secure.ssa.gov/ poms.nsf/lnx/0100203210.) If Appellants cannot by any other means convince Social Security to change their names, they can petition an Indiana court and obtain an order doing so. This burden is especially light considering Hauptly's requirement that a court recognize by order any nonfraudulent name change.[14]

We cannot say that the Bureau's requirement that Appellants, at most, petition for a name change, take the court order to Social Security for a change in its records, and provide the Bureau documentation of Social Security's change constitutes a burden so unreasonable as to be unconstitutional. The arrangement does rationally advance the legitimate state interest of preventing identity theft. Whether it might if harshly administered run afoul of due process is a question for another day.

---

[14] The paperwork required for a name change is similarly light and can be completed by the petitioner. In fact, an easily used form is available on this Court's website at http://www.in.gov/judiciary/selfservice/forms/name-change.html.

## Balancing Potential Injuries

As for whether any potential harm Appellants would suffer outweighs any potential harm to the State resulting from a grant of the injunction, Krueger, 882 N.E.2d at 733, Appellants argue that their harm automatically outweighs any other potential harm because of its constitutional nature. (Appellants' Br. at 27.) Because we have already concluded that no such constitutional injury has or will occur, we reject this argument as unavailing. While we recognize the importance to these individuals of their mobility and ability to conduct day-to-day business under their commonly used names, we cannot say the trial court was wrong to conclude that they do not outweigh the harm that the public might incur by allowing fraudulent licenseholders to continue to use them.

## Public Interest

Finally, the public interest element of the law on injunctions clearly favors the Bureau. In the face of no constitutional violations, Appellants cannot maintain that the public interest lies in obliging the Bureau to recognize casual changes in names effected without resort to formal, minimalist processes. The Bureau has chosen to rely on Social Security's records for these purposes, and this is a legitimate means to the end of distinguishing between individuals, record keeping, promoting public safety, and assigning rights and responsibilities. Shear Kushner, 57 UCLA L. Rev. at 322; See Dannin, 10 U. Mich. J.L. Reform at 170. Although no party claims that the named Appellants have assumed new names for fraudulent purposes, the reason the Bureau has asked them to update their information is to prevent fraudulent activity. Requiring the Bureau to recognize names without verification would just as clearly disserve that interest. Appellants therefore fail on this element.

## Conclusion

We affirm the trial court.  We dissolve the preliminary injunction entered by the Court of Appeals as a stay pending appeal.

Dickson, Sullivan, and Boehm, JJ., concur.
Rucker, J., concurs in result without separate opinion.